950 A.2d 945

COMMONWEALTH of Pennsylvania, Appellee

v.

James DENNIS, Appellant.

Supreme Court of Pennsylvania.

Submitted June 25, 2007.

Decided June 20, 2008.

Daniel Silverman, Esq., Silverman & Associates, P.C. for James Dennis; Ryan David Guilds, Amy McGinnis, Arnold & Porter, L.P., *pro hac vice;* Rebecca Gordon, Arnold & Porter, L.L.P., *pro hac vice,* for James Dennis.

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Justice TODD.

Appellant James Dennis was sentenced to death on October 19, 1992 for the first-degree murder of Chedell Williams in 1991. Appellant now appeals the September 15, 2005 order of the Court of Common Pleas of Philadelphia County dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–46.

Following Appellant's conviction, we affirmed on direct appeal, rejecting numerous challenges, including several pertaining to the constitutional effectiveness of trial counsel. *Commonwealth v. Dennis*, 552 Pa. 331, 715 A.2d 404 (1998) ("*Dennis I* "). Thereafter, at the behest of the Commonwealth, we reversed the PCRA court's order granting Appellant's Motion for Discovery pursuant to Pa.R.Crim.P. 902(E)(2), by which Appellant sought the Commonwealth's *voir dire* notes from trial to support his jury selection challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and remanded for completion of PCRA review. *Commonwealth v. Dennis*, 580 Pa. 95, 859 A.2d 1270 (2004) ("*Dennis II*"). As noted, the PCRA court denied relief, and this appeal followed.[1] For the reasons that follow, we affirm in part, vacate in part, and remand for further proceedings as directed.

## I. BACKGROUND AND PROCEDURAL HISTORY

The facts credited by a jury and prompting Appellant's conviction for first-degree murder twice have been recited by this Court, *see Dennis I*, 715 A.2d at 407; *Dennis II*, 859 A.2d at 1272–73, and for present purposes we need review them only briefly. On the afternoon of October 22, 1991, Appellant and a companion approached 17–year–old Chedell Williams

---

1. This Court has direct appellate jurisdiction over orders denying post-conviction relief in capital cases pursuant to 42 Pa.C.S.A. § 9546(d) and Pa.R.Crim.P. 910. *See Commonwealth v. Christopher Williams*, 594 Pa. 366, 936 A.2d 12, 17 n. 13 (2007). Our standard of review calls for us to determine whether the PCRA court's determinations are supported by the evidence of record and free from legal error. *Id.*

and Zahra Howard as they climbed the steps to the Fern Rock SEPTA station in Philadelphia. They blocked the girls' path, and Appellant demanded that Williams give him her earrings. The girls turned and fled, but Appellant gave chase, catching Williams in the street. He then ripped the earrings from her ears, drew a .32 caliber handgun, and shot her in the neck, killing her. *Dennis I,* 715 A.2d at 407.

Three witnesses had prolonged, unobstructed views of Appellant during and immediately after the shooting: Howard; Thomas Bertha, who was working on a nearby building; and James Cameron, a SEPTA cashier. All three identified Appellant from a photo array, at a line-up, and again at trial. In addition to the eyewitness testimony, the Commonwealth also presented evidence at trial that, on the night following the shooting, Appellant brandished a gun of the kind described by witnesses to the murder. Additionally, a witness testified to the seizure from Appellant's father's house of clothing fitting the description of the shooter's clothing offered by witnesses.[2] Appellant presented a defense of mistaken identity, claiming that he was on a bus to the Abbottsford Homes at the time of the murder. The jury returned convictions on charges of first-degree murder, robbery, criminal conspiracy, violating the Uniform Firearms Act, and possessing an instrument of crime.[3]

In the penalty phase of the proceedings, the Commonwealth sought the death penalty on the basis of two aggravating circumstances: killing while in the perpetration of another felony, 42 Pa.C.S.A. § 9711(d)(6); and knowingly creating a grave risk of death to another person in addition to the victim, *id.* § 9711(d)(7). Appellant presented evidence of three mitigating circumstances: no significant history of prior criminal convictions, *id.* § 9711(e)(1); Appellant's age of 21 at the time of the crime, *id.* § 9711(e)(4); and the "catch-all" mitigator, *id.* § 9711(e)(8). The jury found one aggravating circumstance,

---

**2.** The weapon was never recovered, and the clothing seized from Appellant's residence was lost before trial.

**3.** *See* 18 Pa.C.S.A. §§ 2502(a); 3701; 903; 6101, *et seq.;* and 907, respectively.

killing in the perpetration of a felony, and one mitigating circumstance, no significant history of prior criminal convictions, and concluded that the aggravating circumstance outweighed the mitigating circumstance. Accordingly, the trial court sentenced Appellant to death.

Following the trial court's denial of post-verdict motions, Appellant appealed to this Court, and we affirmed. Because Appellant's appeal occurred before this Court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002) (deferring challenges to the constitutional effectiveness of counsel until collateral review), it was governed instead by our former rule, which required an appellant to raise challenges to the effectiveness of counsel at the earliest opportunity, i.e., the first stage of litigation when appellant was represented by an attorney different than the one whose effectiveness was to be challenged. *See Commonwealth v. Romero*, 938 A.2d 362, 369 n. 4 (Pa.2007); *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687, 695 n. 6 (1977). Thus, on direct appeal in this case, we considered and rejected numerous challenges to the effectiveness of trial counsel.

In particular, Appellant alleged trial counsel ineffectiveness as follows: (1) counsel's failure to investigate trial witness Latanya Cason; (2) counsel's failure to impeach trial witness Charles Thompson regarding the severity of an outstanding criminal charge; (3) counsel's failure to establish the victim's height, which, at 5'10", exceeded Appellant's by 5 inches and, in Appellant's view, created a reasonable doubt as to the height of the shooter; (4) counsel's failure to call eyewitnesses David Leroy and Anthony Overstreet, who observed events surrounding the shooting, including the suspect as he fled, but failed to identify Appellant as the shooter; (5) counsel's failure to raise a claim of improper exclusion of jurors based upon race under *Batson;* (6) counsel's failure to object to three "bad character" witnesses who, in rebuttal to Appellant's nine "good character" witnesses, testified that Appellant's reputation in the community regarding honesty, peacefulness, and law-abidance was less than sterling; (7) counsel's failure to seek a mistrial upon the Commonwealth adducing testimony

regarding Appellant's unemployment in the years preceding the murder; (8) counsel's failure to seek suppression of testimony regarding the clothing seized from Appellant's father's home, which allegedly matched that observed on the shooter by eyewitnesses, when the Commonwealth proved unable to produce the clothing itself; (9) counsel's failure to object to the trial court's instruction, per *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), indicating that the jury "should" receive witness testimony with caution, rather than indicating that they "must" do so; (10) counsel's alleged "bolstering" of the prosecutor's credibility during the defense's closing argument, in his acknowledgment of the prosecutor as "probably the top prosecutor" in his office, *Dennis I*, 715 A.2d at 411; and (11) counsel's failure to object to testimony by a court clerk who testified that Appellant had previously been convicted of possession of crack cocaine with intent to deliver, when, in fact, Appellant's prior conviction had been for simple possession. We rejected each of these issues in turn.

We also rejected direct challenges to the regularity of the trial itself. In particular, we rejected discrete challenges to the prosecutor's closing arguments during the guilt and penalty phases of Appellant's trial, acknowledging that the comments in question to some extent strayed from the evidence presented, but finding the comments non-prejudicial, especially in light of the trial court's curative instructions.

Appellant also sought a remand for consideration of after-discovered evidence. *See Commonwealth v. McCracken*, 540 Pa. 541, 659 A.2d 541, 544–45 (1995) (reviewing the four-prong standard for granting a new trial based upon after-discovered evidence). This request was based on two items. First, Appellant argued that an affidavit secured from Shanaqua Ramsey, a friend of eyewitness Howard, demonstrated that Howard privately had expressed less certainty in her identification of Appellant than she had signaled to the investigating officers. We rejected this claim due to Appellant's failure to indicate why the conversation in question, which occurred nearly a year before Appellant's trial, could not have been discovered prior to trial, and because the evidence would, at

most, serve only to impeach Howard's testimony. *See id.* at 545, 659 A.2d 541 (noting that after-discovered evidence may warrant a new trial, *inter alia,* only where it is not submitted solely for impeachment purposes). Second, Appellant directed this Court's attention to the January 24, 1996 recantation by Thompson of his testimony claiming that he saw Appellant with a gun. Noting the unreliability of recantation, especially where the witness claims to have committed perjury, and further observing that the substance of Thompson's alleged dissembling could have been elicited on cross-examination,[4] we rejected this claim as well.

Finally, Appellant sought a remand for evidentiary hearings on his *Batson* claim; fulfillment of his discovery requests; and for resentencing in light of what he claimed was his disproportionate sentence in light of the sentences imposed in similar cases. We rejected all three claims as wholly lacking in merit and denied relief.

Thereafter, Appellant timely sought relief under the PCRA, submitting his *pro se* PCRA petition on November 25, 1998. Upon the appointment of counsel, Appellant submitted an amended, counseled petition on December 7, 1999 and a further amended PCRA petition on December 1, 2000. Therein, *inter alia,* Appellant renewed his *Batson* challenge, arguing that the Commonwealth struck members of the jury pool on the basis of race. On December 12, 2000, Appellant filed a Motion for Discovery, under Pa.R.Crim.P. 902(E)(2) (denying discovery during the first counseled appeal in capital cases "except upon leave of court after a showing of good cause"), seeking production of the prosecutor's jury selection notes. Following briefing and oral argument, the PCRA court granted the motion. On June 28, 2001, the Commonwealth sought reconsideration of the discovery order, and filed a request for certification of an interlocutory appeal. At first, the trial court granted relief outright, vacating its order. Finally,

4. Specifically, in 1996, Thompson claimed that his pre-trial statement in 1991 had been given the night that he was arrested for an unrelated crime, "and the police said if [he] gave them a statement they probably could help [him]." Charles Thompson Statement, 1/24/96, at 2; Appendix to Initial Brief of Appellant, Exh. 14.

however, the court reinstated its original discovery order. The Commonwealth appealed, and we reversed. *Dennis II*, 859 A.2d at 1279–80.

Upon our remand, the PCRA court denied the Commonwealth's motion to dismiss Appellant's PCRA petition without a hearing, and conducted several days of evidentiary hearings in May 2005. The court solicited post-hearing briefs and, on September 15, 2005, following oral argument, denied Appellant's claims for relief and dismissed the petition in an opinion that, as detailed below, we find wanting in several critical respects.

In fashioning its opinion, the trial court substantially abbreviated and consolidated Appellant's claims for purposes of disposition,[5] and we review them briefly in order, omitting the numerous issues Appellant has declined to pursue on appeal to this Court. First, the court considered, evidently *in toto*, Appellant's various claims of ineffectiveness of counsel for trial counsel's failures to "interview, investigate, conduct discovery and/or competently present exculpatory, alibi, witness-related and/or other evidence," and concomitant claims that appellate counsel was ineffective for failing to raise these issues of trial counsel ineffectiveness on direct appeal. PCRA Court Opinion, 11/17/05 ("P.C.O."), at 4. To this entire category of claims, which spans, by our count, approximately 16 duly argued and appropriately concise pages of Appellant's brief to this Court (having occupied roughly 20 pages of his Supplemental Amended Petition), the court simply responded, without citation or elaboration, that "[t]he record including the evidentiary hearing clearly demonstrates that this undeveloped claim is without merit." *Id.* at 5.

Next, the court considered Appellant's various claims that the Commonwealth withheld potentially exculpatory evidence

5. According to the Commonwealth's description, which appears to be accurate, "Defendant raise[d] more than fifty-three claims, each with several subparts, of ineffective assistance of counsel, trial court error, and prosecutorial misconduct in a PCRA petition that is over 295 pages long, exclusive of the six volumes of exhibits which total approximately 1,000 pages." Motion to Dismiss Defendant's Amended and Supplemental Amended Petitions, 2/7/03, at 5.

in violation of the United States Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"), and that counsel was ineffective for failing to pursue these claims at the appropriate time and in an effective manner. These the court found either previously litigated on direct appeal and thus non-justiciable under the PCRA, *see* 42 Pa.C.S.A. § 9543(a)(3), insufficiently pleaded by Appellant, or otherwise lacking in merit. Notably, the court, referring collectively to all of the *Brady* claims, ultimately concluded that "none of the [*Brady* ] claims involve[d] material evidence favorable to the accused [such] that[,] if disclosed and used effectively, it may make the difference between conviction and acquittal." P.C.O. at 6.

The court also found previously litigated on direct appeal Appellant's due process challenge, by way of counsel's alleged ineffectiveness, to the prosecution's references to clothing that allegedly tied Appellant to the murder notwithstanding that the clothing in question undisputedly was lost prior to trial and thus not entered into evidence.

The court then turned to Appellant's challenge to counsel's effectiveness in contesting the jury selection process. First, Appellant raised the sufficiency of the trial court's "death qualifying" questioning of the jurors regarding their ability to reach a decision requiring imposition of the death penalty. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The court rejected this claim as having been previously litigated on direct appeal and hence could not be considered on collateral review. In a related challenge, Appellant pointed to counsel's failure to "life qualify" the jury, by inquiring whether any jury would automatically apply the death penalty in the event of a conviction for first-degree murder rather than weigh aggravators and mitigators against each other as required by statute. *See Commonwealth v. Speight,* 578 Pa. 520, 854 A.2d 450, 459 (2004). Regarding

"life qualification," the court, quoting this Court's ruling in *Dennis I*, found that Appellant had failed to satisfy his burden to prove that any impaneled juror would automatically impose the death penalty.

Finally, the court rejected Appellant's contentions that the cumulative effect of counsel's alleged serial ineffectiveness was to irremediably prejudice Appellant collectively, if not on a claim-by-claim basis, and rejected Appellant's correlative claim that the collective effect of the other alleged irregularities in the prior proceedings similarly prejudiced Appellant to an extent requiring relief. The court noted that Pennsylvania courts have refused to find meritorious claims in the aggregate where the claims, individually, fail.

## II. DISCUSSION

### A. The Law

Appellant raised a raft of issues on direct appeal concerning the conduct of his trial, both in the guilt phase and in the penalty phase, issues we found meritless. *See Dennis I.* Those rulings bind us presently, through the PCRA's bar against raising, on collateral review, previously litigated legal challenges—those that were raised or could have been raised on direct appeal. 42 Pa.C.S.A. § 9543(a)(3). Thus, we begin by reviewing those principles and others confining the scope of our collateral review.

The PCRA "provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." 42 Pa.C.S.A. § 9542. Among those bases for relief available under the PCRA is the constitutional ineffectiveness of counsel, a claim couched in the Sixth Amendment's guarantee of counsel. *See* 42 Pa.C.S.A. § 9543(a)(2)(ii) (providing for relief when "the conviction or sentence resulted from ... [i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place"). We have held that this extends not only to ineffec-

tiveness during the guilt phase of a capital proceeding, but also to ineffectiveness during the penalty phase, because "the penalty phase is both a 'truth-determining process' and an 'adjudication of guilt or innocence.'" *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1019 (2003) (quoting *Commonwealth v. Chester,* 557 Pa. 358, 733 A.2d 1242, 1249 (1999)). The PCRA, however, "is not intended . . . to provide a means for raising issues waived in prior proceedings." 42 Pa.C.S.A. § 9542. Hence, a petitioner cannot pursue claims on collateral review that were raised, or could have been raised, on direct appeal, *id.* § 9543(a)(3), except where the petitioner pleads and proves that "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.* § 9543(a)(4).

As noted, Appellant's direct appeal preceded this Court's decision in *Grant,* thus it was appellate counsel's burden to plead trial counsel's ineffectiveness on direct appeal rather than deferring those challenges until collateral appeal, as is proper practice now. Counsel's performance is presumed constitutionally adequate, and will be deemed ineffective only upon a petitioner's three-pronged showing that counsel's ineffectiveness was such that, "in the circumstances of the particular case, [it] so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 799 (2007) (citations and internal quotation marks omitted). The three-factor approach utilized in Pennsylvania derives from our application in *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987), of the "performance and prejudice" test articulated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Pierce* test requires a petitioner to prove with respect to the alleged ineffectiveness of counsel that: (1) the underlying legal claim—i.e., that which the petitioner charges was not pursued, or was pursued improperly—has "arguable merit;" (2) counsel's action or omission lacked any reasonable basis designed to serve his client's

interests; and (3) there is a reasonable probability that the outcome of the proceedings would have been different had counsel not been ineffective in the relevant regard—i.e., that the petitioner was prejudiced by counsel's act or omission. *Pierce*, 527 A.2d at 975; *see Christopher Williams*, 936 A.2d at 19. The failure to satisfy any of the above prongs requires rejection of the ineffectiveness claim. *Id.* at 20. Where claims of trial counsel ineffectiveness have already been, or could previously have been, litigated—as in this case, on direct appeal—the only way a petitioner can successfully mount a challenge to the effectiveness of counsel is to assert a "layered" claim of ineffectiveness, establishing first that appellate counsel was ineffective in failing to challenge the effectiveness of trial counsel, which requires as a threshold matter that trial counsel was ineffective in the first instance. *See Romero*, 938 A.2d at 369.

Prior to our decision in *McGill*, our efforts to provide clear guidance regarding how to argue the constitutional ineffectiveness of counsel when the assertion entails the ineffectiveness of both appellate and trial counsel had failed to establish a clear consensus rule. In *McGill*, however, we set out to clarify the standard. In effect, we held that, as to each allegedly ineffective counsel, a petitioner must plead and prove each of the three prongs discretely. Thus, regarding a hypothetical situation in which a petitioner challenges the effectiveness of trial counsel for failing to object to an erroneous jury instruction, and that of appellate counsel for failing to allege trial counsel's ineffectiveness, we offered the following illustration of a properly layered claim of ineffectiveness of trial and appellate counsel:

> [I]n order for a petitioner to properly raise and prevail on a layered ineffectiveness claim, sufficient to warrant relief if meritorious, he must plead, present, and prove the ineffectiveness of [appellate counsel], which . . . necessarily reaches back to the actions of [trial counsel]. To preserve (plead and present) a claim that [appellate counsel] was ineffective . . ., the petitioner must:(1) plead, in his PCRA petition, that [appellate counsel] was ineffective for failing to allege that

[trial counsel] was ineffective for not objecting to the erroneous jury instruction, *see Commonwealth v. Marrero*, 561 Pa. 100, 748 A.2d 202, 203 n. 1 (2000); and (2) present argument on, i.e., develop, each prong of the *Pierce* test as to [appellate counsel's] representation, in his briefs or other court memoranda. Then, and only then, has the petitioner preserved a layered claim of ineffectiveness for the court to review; then, and only then, can the court proceed to determine whether the petitioner has proved his layered claim.

*McGill*, 832 A.2d at 1022. The arguable merit prong regarding appellate counsel, therefore, may be satisfied only by the pleading and proving of all three *Pierce* prongs regarding the underlying allegation of trial counsel's ineffectiveness.

Our prior failure to achieve consensus, however, led us to afford courts and counsel in cases pending PCRA disposition or appeal an avenue to conform their pleadings to the newly clarified requirements, and this avenue is especially important in the instant case. Accordingly, we reproduce the relevant discussion in full:

[W]e recognize that we have not been clear as to exactly what is required of a PCRA petitioner seeking to plead, present, and ultimately prove a layered claim of counsel ineffectiveness. Pennsylvania Rule of Criminal Procedure 905 provides in relevant part as follows:

(A) The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice.

(B) When a petition for post-conviction collateral relief is defective as originally filed, the judge shall order amendment of the petition, indicate the nature of the defects, and specify the time within which an amended petition shall be filed. If the order directing amendment is not complied with, the petition may be dismissed without a hearing.

Pa.R.Crim.P. 905. This rule indicates the desire of this Court to provide PCRA petitioners with a legitimate opportunity to present their claims to the PCRA court in a manner sufficient to avoid dismissal due to a correctable defect in claim pleading or presentation. *See* [*Commonwealth v. Craig Williams,* 566 Pa. 553, 782 A.2d 517, 526–27 (2001) ] (interpreting the predecessor to Rule 905 to require the PCRA court to allow amendment of the petition so that the petitioner can make "a sufficient offer . . . to warrant merits review"). Accordingly, similar to our disposition in [*Craig* ] *Williams,* a remand to the PCRA court may be appropriate for cases currently pending in the appellate courts where the petitioner has failed to preserve, by pleading and/or presenting, a layered ineffectiveness claim in a manner sufficient to warrant merits review.

*McGill,* 832 A.2d at 1024. Thus, in *McGill,* informed by the intention we discerned from Pa.R.Crim.P. 905, this Court exempted from *McGill's* rigid presentation requirements those cases pleaded and filed prior to the *McGill* decision, a remedy we deemed appropriate to address the confusion we acknowledged had arisen from our own jurisprudence on the relevant question, and one we have continued to provide in subsequent cases. *See Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 233–34 (2006); *Commonwealth v. Washington,* 583 Pa. 566, 880 A.2d 536, 540 (2005). Indeed, in *Carson* we held that such a remand is proper unless an appellant has failed, in pleading trial counsel's ineffectiveness, to satisfy the *Pierce* test with respect to trial counsel. *Carson,* 913 A.2d at 234; *see Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651, 657 (2003).

## B. Preliminary Issues

In its brief, the Commonwealth devotes extensive discussion to the global proposition that every issue raised by Appellant is waived for failure to raise it properly before the PCRA court, waived as to trial counsel's ineffectiveness, or waived as to appellate counsel's ineffectiveness, directly or as a function

of improper layering under *McGill.* Brief for the Commonwealth at 9–33.

In any case, the foregoing discussion amply responds to the global argument of the Commonwealth that all of Appellant's issues as raised before this Court are waived for failure properly to plead them in his PCRA petitions before the PCRA court. Brief for Commonwealth at 12–13. Although we grant that most of Appellant's claims in his petitions are couched in terms of ineffectiveness of trial counsel, with very little to suggest a layering analysis, the last of these petitions was filed with the trial court in July 2002, more than a year before we issued our decision in *McGill.*[6] Nor is the Commonwealth correct in suggesting that Appellant effectively lost any claim to the remand remedy outlined in *McGill* for failing to seek to amend its pleadings between the issuance of *McGill* in 2003 and the PCRA hearings in 2005. In *Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 891 (2004), we dispelled any uncertainty in this regard, identifying the *McGill* remand as an appropriate *sua sponte* remedy for this Court to order where the PCRA court has failed to request amended pleadings. *Cf. Rush,* 838 A.2d at 657 (noting the application of the same principle to Supreme Court briefs filed prior to this Court's issuance of *McGill* ); Pa.R.Crim.P. 905(B) (providing that the court "*shall* order amendment" of a defective petition (emphasis added)). Thus, Appellant in the instant case should be entitled, at a minimum, to the treatment specified in *McGill,* enabling Appellant to conform his PCRA pleadings to the *McGill* requirements on remand to the PCRA court. Because, for various reasons outlined below, this case must be remanded to the PCRA court, we will address the question of repleading on remand in our final section of this opinion. For

---

**6.** *But see* Supplemental Materials in Support of Petition Under the Post–Conviction Relief Act and Consolidated Memorandum of Law, 5/24/02, at 24 ¶ 41 (arguing over a year in advance of our *McGill* decision that, "[e]ven if [the PCRA court] were to find that appellate counsel did or could discover the evidence forming the basis for [various alleged deficiencies in trial counsel's pre-trial investigation], appellate counsel's failure to raise this claim on direct appeal constitutes ineffective assistance and was not part of a well-conceived appellate strategy").

purposes of discussion, however, it suffices to say that the Commonwealth's arguments in this regard clearly are inconsistent with Pa.R.Crim.P. 905 and our holdings in *McGill, Edmiston,* and *Carson,* among others, and therefore are rejected.

*McGill,* however, does not save Appellant from the obligation properly to layer his claims before this Court, or from a failure to plead and prove the ineffectiveness of *trial counsel* sufficiently under *Pierce* to satisfy the arguable merit prong for an ineffectiveness claim against appellate counsel, any of which will be fatal to his claims, and all of which, in connection with one or more issues, the Commonwealth argues apply. These arguments by the Commonwealth, however, are not amenable to global treatment. To the extent Appellant fails to overcome the previous litigation bar or other abovementioned principles precluding relief, we will rule accordingly on an issue-by-issue basis.

## C. The PCRA Court's Opinion

As alluded to, *supra,* the PCRA court's opinion is, as to some issues, insufficient to enable us to conduct meaningful review. That the trial court believed Appellant's petition to be excessive we do not doubt, and indeed it seems so to us as well. Furthermore, we have no intention of diminishing the considerable degree of discretion afforded PCRA courts in disposing of collateral petitions under the PCRA. Our deference, however, does not diminish the necessity of the PCRA court's provision of a legally robust discussion, complete with clear findings of fact where required. *See Craig Williams,* 782 A.2d at 522–23; *Commonwealth v. Roy Williams,* 557 Pa. 207, 732 A.2d 1167, 1181 (1999) (remanding and directing the PCRA court to render "findings of fact and conclusions of law" in support of its disposition of issues turning on credibility); *accord Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 738–39 (2000).

We need look no further than the PCRA court's abbreviated disposition of the first issue to illustrate the problem. The first issue it frames is described as follows: "That trial counsel

failed to interview, investigate, conduct discovery and/or competently present exculpatory, alibi, witness-related and/or other evidence, and all prior counsel were ineffective for failing to investigate, raise and/or litigate these issues." P.C.O. at 4–5. The trial court's one-sentence response to the claims encompassed in this catch-all issue provides simply that "[t]he record including the evidentiary hearing clearly demonstrates that this undeveloped claim is without merit." *Id.* at 5.

The claims encompassed in this issue include, at a minimum, Appellant's claims that trial counsel: failed to interview two eyewitnesses to the crime or the events immediately following the crime;[7] failed to interview a known alibi witness with sufficient rigor to discover information tending to support Appellant's alibi;[8] and failed to discover material and substantial impeachment evidence pertaining to the only prosecution witness to put the murder weapon, which itself was never discovered by investigators, in Appellant's hand on the day of the crime.[9] As provided, *infra,* not all of these claims necessarily can prevail. As to each, however, the pleadings are facially sufficient (save for the non-dispositive failure to properly layer claims in the pre-*McGill* PCRA pleadings) to warrant separate treatment by the PCRA court including such findings of fact as are necessary and the conclusions of law on which the denial of the claim is based. A generic statement that the record proves these claims collectively non-meritorious tells us too little to support review. We offer this only to highlight the incompleteness of the PCRA court's opinion; similar instances regarding other issues will be addressed as we take up the issues, *seriatim,* below.

7. *See, e.g.,* Supplemental Amended Petition Under the Post–Conviction Relief Act and Consolidated Memorandum of Law, 12/1/00, at 73–80; Brief for Appellant at 8–17.

8. *See, e.g.,* Supplemental Amended Petition Under the Post–Conviction Relief Act and Consolidated Memorandum of Law, 12/1/00, at 17–20, 80–84; Brief for Appellant at 17–20.

9. *See, e.g.,* Supplemental Amended Petition Under the Post–Conviction Relief Act and Consolidated Memorandum of Law, 12/1/00, at 84–85; Brief for Appellant at 21–23, 39–40.

### D. The Claims

Although Appellant's Statement of Questions Involved enumerates only seven issues, Brief for Appellant at 2, his argument in fact reveals that these issues encompass numerous sub-challenges. As we find that the seven issues as stated duly encompass the more nuanced arguments raised in the body of Appellant's brief, we review the individual assertions as outlined in Appellant's argument in the order in which he presents them.

### *1. Counsel's Pretrial Investigation*

Appellant contends that trial counsel was ineffective for failing to investigate known eyewitnesses George Ritchie, Anthony Overstreet, David Leroy, and alibi witnesses Anissa Bane, Nicole Pope, Ervin Williams, and Mike Shabazz. Additionally, Appellant argues that trial counsel's pre-trial investigation was deficient for failing to obtain accurate information regarding trial witness Charles Thompson's criminal record and status as an accused felon at the time that he provided information to police implicating Appellant in the murder. These claims are those collectively and summarily rejected in a single sentence by the PCRA court as "undeveloped" and "without merit." P.C.O. at 4–5.

Notwithstanding the trial court's troubling failure to articulate its basis for rejecting these claims, we find our decision on direct appeal and the record sufficient to enable us to reject Appellant's claims regarding Ritchie, Overstreet, and Leroy on the merits. The same is not true regarding purported alibi witness Anissa Bane, although we reject the claims regarding Pope, Williams, and Shabazz for other reasons. Accordingly, pursuant to the discussion that follows, Appellant's claims with regard to Bane will be included in our remand order.

As for Appellant's claims regarding Thompson, although we are disturbed by counsel's apparent failure to discover that Thompson in fact was under arrest for felony assault when he provided police with a statement incriminating Appellant, and that the assault charge in question was dropped between Thompson's provision of the statement and his appearance at

trial, we nonetheless find this claim precluded by our decision on direct appeal.

## (a) George Ritchie, Anthony Overstreet, and David Leroy

With regard to George Ritchie, Appellant contends that his claims are neither previously litigated nor waived. Ritchie, Appellant maintains, identified himself in his statement to police as an eyewitness to the murderer's flight from the scene of the killing, and, consistently with all other eyewitnesses, described the killer as wearing a red hooded jumpsuit. He indicated to police on the occasion of his interview that he would recognize the man dressed in red if he saw him again.

Although Appellant acknowledges that trial counsel had Ritchie's police statement prior to trial, he attributes appellate counsel's failure to raise trial counsel's failure to interview Ritchie as arising from the fact that neither the Commonwealth nor prior counsel forwarded Ritchie's statement in advance of the appeal. He notes that current counsel only came into possession of Ritchie's statement in 2002 through discovery effectuated in connection with this PCRA proceeding. Because the factual predicate for the claim was unavailable to appellate counsel, Appellant contends that this claim is not barred as previously litigated under the PCRA.[10]

Regarding Ritchie, the Commonwealth attacks Appellant's failure to raise Ritchie in his first PCRA filing as waiving any such claim,[11] and alternatively argues that Appellant over-

10. Alternatively, Appellant argues that, if Ritchie's statement was available to appellate counsel, then appellate counsel was ineffective for failing to locate the statement. Brief for Appellant at 13 n. 8.

11. While the Commonwealth concedes that Ritchie was addressed in Appellant's Supplemental Materials in Support of the Supplemental Amended Petition and in Appellant's Opposition to Commonwealth's Motion to Dismiss Petitioner's Supplemental Amended Petition, it argues that these documents "are not amended PCRA petitions" and therefore are subject to waiver. The Commonwealth cites no authority for this suggestion that serial filings, approved, accepted, and evidently considered by the PCRA court, nonetheless are not either amended PCRA petitions unto themselves or proper annexes to same. Although our research discloses no entirely on-point precedent in this Court, the Superior Court has ruled, under similar circumstances, that such supplements may properly be considered as part of Appellant's PCRA

states the probative value of Ritchie's "glimpse" of the fleeing assailant, especially as compared to the lengthier looks the trial witnesses had. The Commonwealth also notes several inconsistencies between Ritchie's original statements to police, his PCRA hearing testimony, and virtually every other statement documented in between, including his claim to PCRA counsel in 2002 that, at the time of the shooting, he was in the vicinity of the killing working on his sister's car, while later acknowledging at the PCRA hearing that he does not actually *have* a sister. Notes of Testimony ("N.T."), 5/6/05, at 76.

Anthony Overstreet, another eyewitness to the crime, failed to identify Appellant in the same lineup as other testifying witnesses. In a new affidavit to the court, Appellant notes, Overstreet indicated that he was at the scene of the crime and had a clear view of the shooter from only five feet away. Indeed, he claimed to be closer to the shooter than his co-worker, Thomas Bertha, who identified Appellant as the shooter at trial. Again, however, trial counsel failed to interview Overstreet, despite trial counsel's knowledge of Overstreet's existence and potential testimony through a police affidavit of probable cause noting that Overstreet had made at least one statement to police.

Similarly, trial counsel failed to interview David Leroy, another eyewitness to the crime, also identified by at least one statement given to trial counsel by the Commonwealth. Appellant contends that Leroy offered a description of the shooter at odds with Appellant's physique, which might have been used to Appellant's advantage at trial.

Appellant grants that, on direct appeal, this Court considered challenges to counsel's failure to *call* Overstreet or Leroy

petition for purposes of disposition and review. *See Commonwealth v. Boyd*, 835 A.2d 812, 816 (Pa.Super.2003). The trial court, notably, declined to find this or any other issue waived on such a basis, P.C.O. at 10–11 ("The question of waiver was not addressed by this Court because the claims raised by Petitioner were found to be lacking in merit."). Our foregoing discussion clearly emphasizes the liberal attitude toward pleadings manifest in Pa.R.Crim.P. 905, and how it has informed our decisions in *McGill* and progeny. Given the lack of meaningful argument to the contrary offered by the Commonwealth, this objection must fail here and anywhere else it is raised.

at trial. In our disposition of this challenge, we acknowledged that neither of these witnesses had identified Appellant, but we nonetheless rejected the claim on the basis that Appellant failed to "show how their testimony would have discredited that of the three eyewitnesses who did positively identify him." *Dennis I*, 715 A.2d at 409. Now, Appellant cites the quoted language as indicative of appellate counsel's failure to properly frame and pursue the issue.

Regarding Overstreet, the Commonwealth points out that, despite his failure to identify Appellant in a line-up, he did identify Appellant from a photo array. Thus, it argues that counsel had a reasonable basis for not calling Overstreet—the risk that he would again identify Appellant in open court. Similarly, with regard to Leroy, the Commonwealth notes that Leroy was interviewed by a defense investigator in advance of Appellant's direct appeal, and told the investigator that he refused to make an identification based on his distance from the crime and his brief glimpse of the shooter.

Appellant is correct that the question of failing to interview a witness is distinct from failure to call a witness to testify. *See Commonwealth v. Jones*, 496 Pa. 448, 437 A.2d 958, 959 (1981). He relies on this Court's decisions in *Commonwealth v. Mabie*, 467 Pa. 464, 359 A.2d 369 (1976), and *Commonwealth v. Curry Perry*, 537 Pa. 385, 644 A.2d 705 (1994), for what amounts to the claim that, particularly in a case built all but exclusively on three eyewitnesses' identifications of Appellant as the perpetrator, it is all but *per se* ineffective for trial counsel not to inform himself of, and duly investigate, all other eyewitnesses to the crime. Of the two cases, *Curry Perry* is more apposite to the instant matter. In *Curry Perry*, a capital case on direct appeal, we considered Appellant's allegations that trial counsel had been ineffective for failing adequately to prepare for trial, *inter alia*, for failing to instruct the defense investigator to seek eyewitnesses, instead directing him only to seek three specified character witnesses. While we considered numerous factors that indicated counsel's "abdication of the minimum performance required of defense counsel," 644 A.2d at 709, we did note that "[c]ounsel's failure

to interview witnesses was ineffective, arguably per se." *Id.* (citing *Commonwealth v. Weiss*, 530 Pa. 1, 606 A.2d 439 (1992); *Jones, supra; Mabie, supra* ).

We consider the witnesses in turn. With respect to Ritchie, plainly this Court never considered any claim regarding him, and with good reason—appellate counsel undisputedly was unaware of Ritchie's existence at the time of filing the direct appeal. Nor do we have any articulated basis for the PCRA court's refusal to grant relief on this claim. Even granting, *arguendo,* that trial counsel's failure at a minimum to interview Ritchie satisfies the arguable merit and reasonable basis prongs of *Pierce,* we are unsatisfied that Appellant has pleaded and proved the degree of prejudice necessary to make out a colorable claim.

*Curry Perry* presented a much more blatant case of counsel failing to mount any meaningful defense, such that the "arguably per se" language, in addition to being equivocal in itself, also arguably is *dicta* in the context of that case and hence non-precedential. In none of the cases cited for that proposition, moreover, did we so hold, although we strongly chastised counsel for failing to investigate eyewitnesses. In *Weiss,* for example, we found counsel ineffective for failing to call character witnesses in a sexual assault case prosecuted with less than "overwhelming" evidence of guilt. *Weiss,* 606 A.2d at 443. In *Jones,* we rejected counsel's refusal to interview a former confidential informant, the only eyewitness to his client's alleged crime aside from the client and the arresting officer. *Jones,* 437 A.2d at 959 ("However hostile these witnesses may have appeared to be, there is no basis for the decision neither to interview them nor to attempt to do so. . . . [T]he question here is the decision not to interview them, not the decision to refrain from calling them at trial." (citing *Mabie,* 359 A.2d at 374)). These cases and *Mabie* arguably stand for the proposition that, at least where there is a limited amount of evidence of guilt, it is *per se unreasonable* not to attempt to investigate and interview known eyewitnesses in connection with defenses that hinge on the credibility of other

witnesses. They do not stand, however, for the proposition that such an omission is *per se* prejudicial.

Accordingly, the burden on Appellant in this case remains to plead and prove sufficient prejudice—i.e., a reasonable probability that the outcome of trial would have been different had counsel interviewed and/or called Ritchie to the stand—to establish ineffectiveness of trial counsel. Appellant makes some effort in this regard, but the Commonwealth is clearly correct that Ritchie's statements spanning ten years have never lined up, featuring trivial, even bizarre contradictions. While credibility determinations are not ours to make, prejudice is for Appellant to establish, and on the record pertaining to Ritchie, that burden is substantial. Appellant seems to take prejudice for granted, in reliance on *Curry Perry*, and that case simply does not justify such a posture. Accordingly, we cannot agree that Appellant has satisfied his burden. His claim of ineffectiveness of appellate counsel lacks arguable merit, because he has failed to plead and prove that trial counsel's failure to interview Ritchie resulted in prejudice at trial.

Regarding Overstreet and Leroy, we held in *Dennis I* that Appellant failed to plead and prove "how their testimony would have discredited that of the three eyewitnesses who did positively identify him." *Dennis I*, 715 A.2d at 409. A review of Appellant's brief before this Court on direct appeal reveals that Appellant presented substantially the same claims regarding the possible effects of Overstreet's and Leroy's testimony, had counsel interviewed them and decided to call them, that he does now. In particular, then as now, Appellant presented this Court with observations regarding Overstreet's comment to testifying eyewitness Bertha that he thought he recognized the person Bertha identified as the shooter, as well as Overstreet's identification of Appellant from a photo array. Then as now, Appellant claimed that Leroy's testimony would have established that the shooter was wearing a hat pulled down low, and thus would have called into question the ability of the testifying witnesses, who undisputedly had lengthier opportunities to examine the shooter, to reliably identify him

later. Plainly, we found that Appellant's assertions in these regards failed to establish sufficient prejudice to sustain an ineffectiveness claim, regardless of the claim's arguable merit or the arguable absence of a reasonable basis for trial counsel to at least attempt to interview these witnesses. Thus, as the question of prejudice with regard to the inquiry concerning ineffectiveness of trial counsel has been previously litigated and rejected, Appellant cannot satisfy the arguable merit prong of *Pierce* with regard to appellate counsel's ineffectiveness.

*(b) Anissa Bane, Nicole Pope, Ervin Williams, and Mike Shabazz*

Appellant contends that trial counsel was ineffective for failing to interview potential alibi witnesses Anissa Bane, Nicole Pope, Ervin Williams, and Mike Shabazz. Appellant notes that trial counsel testified at the PCRA hearing that his initial intention had been to develop an alibi defense, and to support that defense "by any witnesses, documentation, whatever." N.T., 5/5/05, at 32.

Bane testified at the PCRA hearing that, at around the time of the crime, Appellant called her from his father's house, which she claimed she could confirm because she had recognized the phone number on her caller ID device, because she recognized Appellant's father's voice in the background, and also because she had cause to call Appellant back at that location. She testified that she tried on several occasions to reach trial counsel, believing that the timing of her telephone conversations with Appellant on the afternoon of the murder might be probative of his innocence, and would have been willing both to release her phone records to defense counsel and to testify at trial, had she been called. Indeed, she testified that she visited the courthouse during the trial, anticipating that her presence somehow would come to defense counsel's attention, and that she would be called to testify. Bane contended that Appellant's investigator visited her but did not actually interview her, a claim the investigator denied remembering, but neither confirmed nor denied at the

hearings. Trial counsel testified that he neither sought her telephone records nor sought to interview her.[12]

Appellant contends as well that counsel failed to interview potential alibi witnesses Nicole Pope, Ervin Williams, and Mike Shabazz. He alleges that Pope was with Appellant between 2:00 P.M. and 3:00 P.M. on the day of the killing, which occurred at approximately 1:50 P.M. Williams, Appellant's barber and former neighbor, claimed to have seen Appellant near the Abbottsford housing project, several miles from the murder scene, at approximately 2:30 P.M., consistent with Appellant's claim that he was on a bus headed to Abbottsford at the time of the shooting, and arrived between 2:00 and 2:30 P.M. He also would have testified that Appellant was not clean shaven that day, in contradiction of the claims of eyewitnesses to the crime.[13] Finally, Appellant alleges that Shabazz was a potential alibi witness who trial counsel did not attempt to interview. Appellant contends that "[t]rial counsel's failure to interview any of these witnesses is symptomatic of an overall failure to fulfill the obligations of a reasonable and competent lawyer." Brief for Appellant at 19.

Appellant notes that these claims were not raised on direct appeal, and argues that they are not waived. Appellant emphasizes that appellate counsel's appellate strategy explicitly was "to include all meritorious claims in [the] appeal in this case," *see* N.T., 5/10/05, at 27–28, and contends that this is one such claim. Appellant argues that this evidence, had any of it proved worthy of presentation, would have bolstered rather than detracted from trial counsel's defense theory, and thus its absence necessarily prejudiced him insofar as, had three more witnesses testified to Appellant's location miles from the scene

12. In considering Bane's testimony on this point, it is worth noting that *it can hardly be the case that her calls went entirely unnoticed by trial counsel* and that the investigator had cause to visit her at home. Presumably, the investigator would not have showed up at her house had counsel not dispatched him to do so.

13. Appellant does not specify to what effect Shabazz would have testified, asserting merely that Appellant's investigator learned that Shabazz was a potential alibi witness during another interview, yet failed to speak to Shabazz.

of the crime at times very near the time of the shooting, their testimony "would have materially bolstered Mr. Dennis' only affirmative defense at trial." Brief for Appellant at 21.

The Commonwealth rejects Appellant's claims regarding Bane in three ways. It contends Appellant has failed to establish that trial counsel had any cause to know of Bane's existence let alone her ability to offer alibi evidence; that the testimony Bane would have rendered was not in fact alibi testimony; and that, in any event, trial counsel could not have been found ineffective for failing to present cumulative alibi testimony. Regarding the first point, the Commonwealth claims that only Bane's own PCRA testimony gave any conclusive reason to believe that trial counsel knew of her existence.

Regarding the nature of the testimony, the Commonwealth contends that the testimony in question fails to place defendant "at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." Brief for Commonwealth at 26 (quoting *Commonwealth v. Johnson*, 538 Pa. 148, 646 A.2d 1170, 1172 (1994)). Bane's claim that she spoke to Appellant at some time between 1:30 and 2:30 P.M. on the day in question, the Commonwealth argues, cannot satisfy so strict a standard with regard to a shooting that occurred at approximately 1:50 P.M., and indeed might have contradicted the defense testimony of Willis Meredith, who testified that he saw Appellant at the Abbottsford Homes at approximately 2:15 or 2:30 P.M.

Finally, the Commonwealth contends that, in any event, Bane's proposed testimony would have been at best cumulative of other trial testimony, and thus cannot form the basis of an ineffectiveness claim. In particular, the Commonwealth notes Appellant himself, in his statement to police, claimed that he left his father's house at 1:30 P.M., the earliest possible time Bane claimed the call occurred, and that Appellant again testified at trial that he left his father's house at 1:30 or 1:45 P.M. Moreover, both Appellant and his father testified that Appellant boarded a bus bound for Abbottsford Homes at approximately 1:50 P.M. Thus, the Commonwealth

contends this testimony was cumulative, and cannot support an ineffectiveness claim, citing, *inter alia,* this Court's decision in *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1229 (2006) ("A defendant is not prejudiced by the failure of counsel to present merely cumulative evidence....").[14]

Appellant, in his Reply Brief,[15] citing trial counsel's PCRA testimony, notes that trial counsel never disputed that Bane attempted to contact him, and that the testimony Bane claimed she would have offered was sufficiently proximal in time to the killing—noting in particular, that emergency responders arrived prior to 2:00 P.M., and implying that the 1:50 P.M. estimate of the time of shooting may have been conservatively late—to amount to alibi evidence adequate to create reasonable doubt and sufficient to warrant trial counsel's investigation, at a minimum.

Our review of the transcripts confirms the substance of Appellant's reply, establishing in particular that trial counsel testified that the name "Anissa Bane" did not "ring any bells" for him, N.T., 5/5/05, at 123, and that Bane testified, quite clearly and at some length, regarding her repeated attempts to contact trial counsel (whose name she recalled unprompted at the hearing), and the messages she left with his secretary indicating that she had information that might be pertinent to Appellant's case. N.T., 5/6/05, at 194–95. Similar uncertainty regarding whether an investigator ever visited her, and if so how he conducted himself, are reflected on the record. *Compare* N.T., 5/6/05, at 195–97 (Bane testifying regarding her encounter with the investigator) *with* N.T., 5/10/05, at 93–98

14. In a case built on eyewitness testimony of an event that happened quickly, it seems no more reasonable to characterize as "cumulative" what, Appellant argues, would have been witnesses in addition to, *inter alia,* his father to attest to his alibi, unless we are to say the same of the second and third eyewitnesses to testify for the Commonwealth. Where the defense is one of mistaken identity, and the only alibi witness Appellant presents is his father, it seems plain that the addition of an unrelated alibi witness whose testimony corroborates other testimony tending to exculpate Appellant is not "merely cumulative" in the *Spotz* sense, and hence, alone, cannot obviate the potential for prejudice in trial counsel's failure properly to investigate that witness.

15. Appellant declines to take up the Commonwealth's claims regarding Pope, Williams, and Shabazz in his Reply Brief.

(investigator Cohen testifying that he had no recollection of interviewing Bane one way or another, and that any notes he might have taken of such an encounter would have been handed over to counsel at the time).

Here, we confront the limitations imposed on us by the PCRA court's failure to provide clear findings of fact, including credibility determinations, and conclusions of law that enable us to track and evaluate the court's analytic process. We decline to assume that the trial court made the requisite findings of fact, as between this contrasting testimony, to dispense with Appellant's claim that trial counsel was ineffective for failing to investigate Bane, and that appellate counsel was ineffective for failing to discover and assert trial counsel's ineffectiveness in this regard. Accordingly, our remand order will direct the PCRA court, at a minimum, to explain its ruling vis-à-vis Bane in a form that is sufficiently precise to afford the prospect of meaningful appellate review.

Regarding the other potential alibi witnesses, the Commonwealth contends that Appellant, having failed to call those witnesses at the PCRA hearing, failed to carry his burden of demonstrating that their testimony would have been helpful. Although he did inquire of trial counsel, at the hearing, whether he recalled the names Shabazz, Pope, and Williams, and established that trial counsel did not, counsel for the Commonwealth also notes that he did not specifically question trial counsel about his alleged failures to interview or call these witnesses. The Commonwealth rejects Appellant's reliance, with respect to these three putative alibi witnesses, on affidavits attached to his PCRA petition, noting that these are proffers required to demonstrate the necessity of a PCRA hearing, but are not, themselves, evidence. Moreover, the Commonwealth notes Appellant cannot claim that the PCRA court prevented him from calling these witnesses. Rather, the court provisionally granted permission to Appellant to call Shabazz, the only one of the three Appellant submitted to the court on his list of witnesses, but Appellant failed to do so. These omissions, the Commonwealth contends, prevent Appellant from demonstrating trial counsel's ineffectiveness, and

.thus from satisfying the arguable merit prong regarding appellate counsel's alleged ineffectiveness.

We agree with the Commonwealth that Appellant failed to carry his burden before the PCRA court by failing to take the requisite steps to secure these witnesses' testimony at the evidentiary hearing that was held precisely for that purpose. Accordingly, we find Appellant has failed adequately to plead and prove his foundational claim of ineffective assistance of trial counsel with respect to putative alibi witnesses Pope, Williams, and Shabazz because without their testimony Appellant cannot demonstrate prejudice sufficient to establish ineffectiveness of trial counsel. Therefore, Appellant is not entitled to relief on his claims deriving from counsel's failure to interview these three potential witnesses.

### (c) Charles Thompson

Appellant also contends trial counsel was ineffective for failing to discover that prosecution witness Charles Thompson was under arrest for assault against a pregnant woman the same day he made a statement to police. Thompson, Appellant observes, was the only witness to link Appellant to a gun that resembled the one other witnesses observed being used in the shooting.[16] Although trial counsel was aware that Thompson had a criminal record involving drugs, he failed to learn of this pending charge in time to use it to impeach Thompson at trial, a tactic Appellant opines would have been especially effective in light of the fact that the assault charge was dropped at some time between Thompson's original statement and his appearance at Appellant's trial. Appellant argues that this issue is neither previously litigated nor waived because no counsel learned of Thompson's assault charge until after direct appeal, a failure Appellant argues reflects ineffectiveness on the parts of both counsel.

On direct appeal, this Court considered a different challenge to trial counsel's ineffectiveness in connection with Thompson.

---

16. The gun itself was never discovered, hence this testimony was a critical component of the prosecution's effort to put the murder weapon in Appellant's possession.

Thompson had testified at trial that he had an open criminal case for misdemeanor drug possession. Appellate counsel argued that trial counsel was ineffective for failing to discover that the open charge in fact was for possession with intent to deliver, a felony. We rejected this claim, however, on the basis that trial counsel adequately impeached Thompson's testimony by other means, concluding, "Even if the proposed impeachment had caused the jury to disbelieve Thompson's testimony in its entirety, ... there is no indication that the outcome of the trial would have been different." *Dennis I*, 715 A.2d at 409. Thus, we effectively held that Appellant had failed to satisfy *Pierce's* prejudice prong with respect to Thompson.

Having so held, nothing Appellant now argues, notwithstanding the emergence of new evidence arguably of value in impeaching Thompson's testimony, demonstrates the prejudice lacking in his presentation on direct appeal. Doubts regarding the adequacy of trial counsel's impeachment of Thompson cannot be resurrected with the emergence of new information, even assuming that information was probative of his credibility beyond the impeachment evidence that was actually utilized by trial counsel. Having failed to establish the prejudice prong under *Pierce* with regard to appellate counsel, Appellant is entitled to no relief on this claim.[17]

### 2. Claims Under Brady v. Maryland, 373 U.S. 83 (1963)

Appellant asserts that the Commonwealth failed to disclose materially exculpatory evidence in advance of trial in violation of *Brady*, including statements tending to show that another person murdered the victim and material impeachment evidence, and further contends that the cumulative effect of these

---

17. Our analysis in this regard also applies to Appellant's corollary claim regarding the prosecution's alleged *Brady* violation in failing to divulge evidence of Thompson's assault charge. Appellant also cannot demonstrate the requisite prejudice necessary to warrant relief on a *Brady* claim. *See Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 305 (2002); *cf. Brady*, 373 U.S. at 87, 83 S.Ct. 1194 (holding that the suppression of exculpatory evidence by the prosecution violates due process "where the evidence is material either to guilt or to punishment").

failed disclosures, if no particular non-disclosure individually, was sufficiently prejudicial to warrant relief. We reject elsewhere Appellant's assertions regarding the *Brady* claims in connection with Charles Thompson, *supra* n. 17, and Latanya Cason, *infra,* and consider the remaining claims in turn.

 In addition to the various showings necessary to establish cognizability under the PCRA (in these instances, those governing the presentation of previously unavailable exculpatory evidence, 42 Pa.C.S.A. § 9543(a)(2)(vi)[18]), to establish a *Brady* violation Appellant must demonstrate that the prosecution suppressed material exculpatory evidence and, in so doing, prejudiced Appellant. *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 305 (2002). The prejudice inquiry requires a showing that the evidence in question was material to guilt or punishment, and that there is a reasonable probability that the result of the proceeding would have been different but for the alleged suppression of the evidence. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

### (a) The William Mitchell Frazier Statement

Appellant contends that the police should have disclosed the statement provided to police by William Mitchell Frazier on November 1, 1991, ten days after the Williams murder. That statement, Appellant contends, implicates another person, or other persons, in the murder. Specifically, according to the statement, on October 30, 1991, Frazier's aunt called Frazier in prison and informed him that his friend Tony Brown had called for Frazier several times. The two arranged to call Brown back together,[19] whereupon Brown allegedly told Frazier that Brown, Frazier's cousin Ricky Walker, and a third individual named Skeet had been involved in "the incident on

18. Section 9543(a)(2)(vi) makes cognizable claims arising from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced."

19. How, precisely, this was possible while Frazier was in prison is unclear.

the news about the girl that got killed over the earrings." Supplemental Materials in Support of Petition Under the Post–Conviction Relief Act and Consolidated Memorandum of Law, 5/24/02, at 8 (quoting Statement of William Frazier, 11/1/91). Brown allegedly offered more detail, and indicated that during the course of the robbery, the gun he was using to threaten the victim accidentally went off. He further described how the three individuals hid in Frazier's apartment for several days thereafter. Brown also told Frazier that he and Walker knew the girl, and that she was the girlfriend of "Kev," and identified the latter as driving a blue Nissan Pathfinder. Brown also indicated that the three had sold the earrings at a pawnshop.

Following this discussion, Frazier told police that he knew Brown to commit robberies and described where Brown kept his guns. He provided addresses, phone numbers, and descriptions of Walker, Brown, Skeet, and others. Moreover, he agreed to a ride-along with police, during which he pointed out each address he had provided; he also signed a waiver permitting police to search his apartment, where Brown had claimed the three assailants hid after the murder. Police followed up by interviewing Walker and Walker's landlord, but, allegedly conducted no further investigation before trial—in particular, failing to interview Frazier's aunt, Brown, Skeet, or the owner of the pawn shop. Pointing, *inter alia,* to the statement of one Kevin Williams, who acknowledged that he was the victim's boyfriend; the similarities between the physical description of Brown and the shooter; and the involvement of Frazier's allegedly disinterested aunt in the phone conversation between Brown and Frazier, Appellant contends that this information, in the aggregate, was plainly exculpatory and thus subject to the Commonwealth's obligation to disclose such information pursuant to *Brady.* Thus, the Commonwealth committed a material and prejudicial violation of that obligation in failing to turn over any information pertaining to Frazier until January 2002, pursuant to the PCRA court's discovery order. *See Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242, 1245 (1994) ("In determining the materiality of the omitted evidence we must, therefore, consider any adverse

effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well.") (citation omitted).

The Commonwealth responds that Appellant's claim regarding the Frazier statement fails for procedural and substantive reasons. First, the Commonwealth contends that the Supplemental Materials in Support of Petition Under the Post-Conviction Relief Act and Consolidated Memorandum of Law and the Appendix containing Frazier's statement were not properly petitions under the PCRA and thus were not properly before the PCRA court.[20] Barring that, the Commonwealth argues that the Frazier lead was fruitless, immaterial, and therefore not subject to the Commonwealth's disclosure obligation under *Brady*. The Commonwealth points first to the strength of the competent evidence implicating Appellant in the murder, and then notes that Frazier was in prison at the time of the statement serving time for robbery and related charges, undermining his credibility. It also notes inconsistencies between Frazier's statements to Montgomery County detectives on October 31, 1991, and to Philadelphia police on November 1, 1991, the latter statement being the one focused upon by Appellant. It notes that by the time of this statement the Commonwealth had considerable evidence of Appellant's guilt, and that, while they nonetheless investigated Frazier's claims at least preliminarily, not only were they unable to verify them but indeed the people they questioned in connection with the story tended to undermine Frazier's account, as well as reveal motives for Frazier to be less than truthful. Thus, the Commonwealth argues, even if properly presented to the PCRA court, the evidence in question was immaterial and, as such, not subject to *Brady* disclosure.

20. The Commonwealth also contends that Appellant's failure to disclose this information within 60 days of its discovery violates the timeliness provision of 42 Pa.C.S.A. § 9545(b)(2). The Commonwealth fails to note, however, that this is a saving provision for petitions otherwise untimely filed outside the PCRA's default one-year time limit. As we have concluded these materials are duly filed supplements or amendments to Petitioner's first PCRA petition, *see supra* note 11, they were not untimely in the first instance, hence there is no need to consider the application of any timeliness exception.

■■■ Problematically, the PCRA court failed entirely to address this discussion, thus, were there any controversy with regard to this claim, especially one requiring factfinding, we would remand. *See Craig Williams,* 782 A.2d at 522–23. We find, however, that Appellant failed to respond adequately to the Commonwealth's legal argument based upon our decision in *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848 (2005). In *Lambert,* the appellant argued the Commonwealth's failure to disclose various police activity sheets denied him access to exculpatory evidence tending to show that someone other than the appellant had committed the crimes in question. 884 A.2d at 857. With respect to one of these activity sheets, we disagreed with the appellant's characterization of the information contained on the sheet, opining that the information at issue "was an initial lead based on hearsay and speculation." *Id.* We emphasized that "the prosecution is not required to disclose to the defense every fruitless lead followed by investigators of a crime." *Id.* (citation and internal quotation marks omitted). We also added our view that "inadmissible evidence cannot be the basis for a *Brady* violation." *Id.* (citing *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995); *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202 (2003)). Accordingly, we held that the Commonwealth had not violated *Brady* because it had not suppressed a document subject to disclosure under that case.[21] *Lambert* indicates that evidence sought under *Brady* be material and admissible. In the absence of any argument regarding the gravamen of *Lambert* and its effect on the continuing precedential value of *Green,* Petitioner has failed to establish a basis for relief with regard to this evidence.

*(b) Police Activity Sheets Regarding Mannasett Pugh and Diane Pugh*

■■■ In his next *Brady* claim, Appellant asserts the Commonwealth failed to disclose activity sheets addressing police

---

**21.** Later in *Lambert,* we again rejected a *Brady* claim by reference to the inadmissibility of the evidence in question, citing on *Mitchell* in support. *Lambert,* 884 A.2d at 857.

interviews with Mannasett and Diane Pugh, the victim's aunt and uncle, indicating that eyewitness Zahra Howard told them that two other previously unmentioned individuals, Kim and Quinton, witnessed the crime, and also indicated that she (Howard) knew the assailants as classmates from Olney High School. Because Appellant never attended that school, Appellant contends that this would have been a critical investigative lead, and that Howard's alleged statements to her aunt and uncle, to the extent they contradicted her statements to police and her testimony, would have constituted material impeachment evidence as well. The Commonwealth, however, neither disclosed the activity sheet in question nor the substance of these alleged statements until it did so in satisfaction of the 2002 discovery order. Appellant emphasizes that neither trial counsel nor appellate counsel recalled at the hearing that any of this information had been made available to them, and trial counsel testified that its defense strategy had been heavily reliant on impeaching Howard by any available means.

The Commonwealth responds that the activity sheet does not support Appellant's characterization insofar as it neither identified Kim and Quinton as eyewitnesses nor the assailants as "classmates." The Commonwealth notes that the prosecution is required to disclose impeachment evidence only "when the reliability of a given witness may well be determinative of guilt or innocence." Brief for the Commonwealth at 49 (quoting *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1049 (2002)).[22] The Commonwealth also asserts that the information is double hearsay, inadmissible as such, and thus immaterial under *Brady*. In addition, the Commonwealth rejects Appellant's attempt to synthesize elements of the Pughs statement and the Frazier statement—which we have ruled, *supra*, is not subject to *Brady* disclosure in this case—into an alternative theory of the case.[23]

22. The Commonwealth again attempts to argue waiver and timeliness on the same bases asserted with respect to the Frazier evidence. We find this line of argument ineffective for the same reasons set forth in connection with that discussion.

23. For example, Appellant asserts a corroborative effect between the Pughs-derived claim that Howard knew the assailants from her high

The Commonwealth's attempt to downplay the value of the activity sheet, or the content thereof, to trial counsel in formulating a mistaken-identity defense fails. Its characterization of the activity sheet as "inexact," Brief for the Commonwealth at 48, is non-responsive with regard to the claim that the report would have led trial counsel down new investigative avenues that had the potential to materially undermine the prosecution's case. *See* Police Activity Sheet, 10/24/91, at 2, Appendix to Initial Brief of Appellant, Exh. 25 ("The aunt states that during her talk with Howard she stated that KIM and QUINTON were at the scene when the shooting happen [sic], among a group of other friends. She further states that ZAHRA indicated she knew the suspect(s) from Olney High School. Mrs[.] Pugh further stated that Quinton is her nephew.").[21] Unlike the Frazier evidence below, however, Appellant expressly couches the utility of this evidence in its value as impeachment of one of the Commonwealth's key witnesses, and thus resists the claim of inadmissibility.[25]

On this record we are unprepared to reject this *Brady* claim on the basis that we rejected the claim regarding the Frazier evidence, especially in light of the trial court's failure to identify with particularity its basis for rejecting it. Thus, we remand for the PCRA court to dispose of the question in the first instance. This observation, of course, does not preclude the PCRA court from finding the claim waived or non-meritorious; it merely reinforces our reluctance to act in the absence of any guidance from the lower court on issues with at least

school and the Frazier-derived claim that Walker admitted knowing the victim from high school.

**24.** In the same report, listed under "THINGS TO DO," was an indicated intent to interview the Pughs and Quinton, at a minimum. Thus, any suggestion that the lead was insufficiently material from an investigatory point of view is belied by the Activity Sheet itself, regardless of whether investigators ultimately made good on the intention.

**25.** The Commonwealth resists the characterization of Howard as a key witness. Howard was beside the victim at the beginning of the encounter, and was one of three eyewitnesses to identify Appellant at trial. We cannot conclude on the record before us that successful impeachment of her testimony would not have changed the outcome at trial, hence this argument is unpersuasive.

arguable merit. Accordingly, we include this matter in our remand order.

### (c) The Altered SEPTA Accident Report

Appellant next points to a copy of the SEPTA accident report concerning the shooting, produced at 2002, that diverged from another edition of that report produced at trial, and contends that the prosecution's failure to disclose the discrepant report constitutes a *Brady* violation. Appellant makes a great deal of the fact that, while the SEPTA accident report provided to trial counsel was blank in the space provided for indicating the number of witnesses, and indicated bus driver "57" as the one who radioed the accident to dispatch, another copy of that report secured in 2001 listed "dozens" of witnesses and bus driver "28" instead of "57." Appellant asserts that these discrepancies suggest that the originally furnished report was doctored, casting doubt on the credibility of the trial testimony of eyewitness James Cameron, the SEPTA employee who filled out that report. Appellant contends that, "if trial counsel was provided with both versions of the report, he could have pursued further investigation of the 'dozens' of witnesses to the crime, attempted to contact the '28' bus driver, and most significantly, conducted an effective cross-examination of Mr. Cameron, one of only three eyewitnesses to testify at trial." Brief for Appellant at 39. Appellant contends that this reveals an "adjustment" to the witness's original story of the sort deemed problematic in *Kyles*, 514 U.S. at 419, 115 S.Ct. 1555.

The Commonwealth counters that the second report was available to Appellant with the exercise of reasonable diligence and thus cannot be the subject of a *Brady* violation. *See Commonwealth v. Treiber*, 582 Pa. 646, 874 A.2d 26, 33 (2005). Alternatively, the Commonwealth argues that the emergence of the second report would not have created a reasonable probability of a divergent trial result.

We find that Appellant has failed to prove the materiality of these slightly divergent reports. As the Commonwealth fairly observes, it appears never to have been disputed that there

were many potential witnesses of this early afternoon murder near an urban transit station. Indeed, the Commonwealth points out that Cameron testified at trial that there were approximately fifty people in the vicinity of the murder, and also admitted on the stand some confusion regarding the identity of the driver as the operator of the 28 or the 57, further undermining any claim of a lost impeachment opportunity. Appellant has entirely failed to establish that any arguable disclosure violation regarding these reports was material to the trial outcome, a requirement under *Brady*, hence this claim fails.[26]

### 3. Testimony Regarding Inculpatory Evidence Unavailable at Trial

In Appellant's next issue, he contends that trial counsel erred in failing to raise an objection, pursuant to the confrontation and due process clauses of the United States Constitution, *see* United States Const. amends. VI, XIV, to prosecution testimony regarding clothing allegedly seized from Appellant's father's home and resembling that described as being worn by the shooter when the clothing itself had been lost by the police and was unavailable at trial. In an effort to frame this argument as divergent from that raised and decided by this Court on direct appeal, *see Dennis I,* 715 A.2d at 410 (rejecting Appellant's claims of ineffectiveness of trial counsel by reference to counsel's reasonable strategy of using the absence of the evidence to impeach the credibility of the prosecution's case), Appellant characterizes the challenge resolved on direct appeal as "relat[ing] solely to counsel's ineffectiveness for not objecting to the testimony or argument about this evidence, and for not asking for a missing evidence instruction." Brief for Appellant at 48. The constitutional

**26.** Appellant also argues that the effect of the above-asserted *Brady* violations must be considered cumulatively. *See Kyles,* 514 U.S. at 537, 115 S.Ct. 1611 (addressing cumulation of materiality in the *Brady* context). We cannot resolve this question instantly, because, in the absence of trial court guidance on the various component *Brady* claims outlined above, we simply do not know the extent of the information we are dealing with. Accordingly, we leave this matter for consideration if and when it ripens for our review.

claims, Appellant effectively argues, were compelling where those others were not, and appellate counsel was ineffective for failing to raise them, or for failing to raise trial counsel's ineffectiveness for failing to raise the constitutional issues in the first instance.

Appellate counsel indeed declined to raise constitutional issues, or trial counsel's ineffectiveness on that point, but rather challenged trial counsel's effectiveness in failing to challenge the chain of custody, the police officers' good faith, or at a minimum to argue that the prejudicial effect of the testimony outweighed its probative value. Appellant declines to observe, however, that on direct appeal we noted a clear tactical choice on the part of trial counsel, who "emphasized the absence of the clothing to derogate the credibility of the prosecution's entire case." *Dennis I*, 715 A.2d at 410. We identified this as "a reasonable attempt to advance Appellant's interests," and declined to find trial counsel ineffective. *Id.* In light of this conclusion, we clearly held that trial counsel had a reasonable basis for his approach to the matter of the missing physical evidence. Thus, the question has been previously litigated with regard to the reasonableness of trial counsel's strategy, and Appellant cannot satisfy the arguable merit prong of *Pierce* with regard to appellate counsel's ineffectiveness in this regard.

### 4. The Court's Flight Instruction

Appellant argues that the trial court erred in including a "flight instruction" in its jury charge. Appellant argues that no evidence was presented suggesting that Appellant made any effort to evade police, and that if a perpetrator's flight from the scene of the crime at the time of its commission is sufficient to incur such an instruction, then it will be warranted in virtually every criminal trial. Appellant also notes, correctly, that the PCRA court provided no basis for rejecting this claim. It may have intended to rule on this claim in its opinion to the extent it rejected *in toto* all of Appellant's jury charge challenges simply by referring to their harmony with Pennsylvania's Standard Jury Instructions, and suggesting

that, in issuing instructions consistent with that source, there can be no impropriety. P.C.O. at 7–8. The problem with this ruling is that it does not reach the question of whether the issuance of a particular charge is proper, as to which merely noting that the purportedly improper instruction was, itself, in compliance with familiar standards is plainly non-responsive.

Appellant, however, fails to make any effort before this Court to layer his ineffectiveness claim pursuant to *McGill*, which long had been the law of Pennsylvania by the time the instant brief was filed. Appellant simply omits to consider the performance of appellate counsel entirely in connection with this issue, and accordingly has failed to plead a claim we can consider. We therefore affirm the trial court's disposition of this issue.

### 5. *"Death Qualifying" and "Life Qualifying" the Jury*

Appellant's next claims pertain to the trial court's conduct of *voir dire*, trial counsel's performance in addressing the same, and appellate counsel's failure to raise certain issues arising from that process. Appellant's challenges concern the court's "death qualification" of the jurors, and trial counsel's failure to actively "life qualify" the jurors thereafter.

"Death qualification" is generally accepted to mean the process by which a venire person is determined to be able to follow both the juror's oath and the law, despite personal beliefs that the individual may possess either for or against the death penalty. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Similarly, the process of "life qualification" involves the exclusion of prospective jurors from the jury on the basis of a fixed opinion that the death penalty must be imposed upon a conviction for first-degree murder. *Speight*, 854 A.2d at 459.

### (a) *"Death Qualification"*

As a general proposition, the Commonwealth "infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all those members of the venire who express

conscientious objections to capital punishment." *Witt,* 469 U.S. at 416, 105 S.Ct. 844. Thus, the Constitution requires only a potential juror whose views on the death penalty would "prevent or substantially impair" the performance of his or her duties as a juror in accordance with the juror's instructions and oath may be excused for cause. *Id.* at 424, 105 S.Ct. 844.

■ The Commonwealth however, retains a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." *Id.* at 416, 105 S.Ct. 844. Just last year, the United States Supreme Court distilled four principles in this area from its prior precedent:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon,* 391 U.S., at 521, 88 S.Ct. 1770, 20 L.Ed.2d 776. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. *Witt,* 469 U.S., at 416, 105 S.Ct. 844, 83 L.Ed.2d 841. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id.,* at 424, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment owed deference by reviewing courts. *Id.,* at 424–434, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841.

*Uttecht v. Brown,* 551 U.S. 1, ——, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007).

■ As to this final principle of deference, the Supreme Court stressed, "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire,

and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Id.* (citations omitted). Our Court has also emphasized the great degree of deference to be accorded the trial court's judgment in this area. We will not reverse the trial court's decision to remove a juror absent an abuse of discretion. *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811, 818 (1985). Furthermore, in making this determination, a juror's bias need not be proven with "unmistakable clarity." *Witt,* 469 U.S. at 424, 105 S.Ct. 844; *Commonwealth v. Morales,* 549 Pa. 400, 701 A.2d 516, 525 (1997). With these general principles in mind, we turn to consideration of Appellant's arguments.

■ Appellant contends that the trial court's allegedly improper death-qualification procedure denied him an impartial jury in three ways. First, Appellant takes issue with the process employed by the trial court for assessing whether a juror could perform his or her duties. The trial court, with the assent of defense counsel, asked the first panel of prospective jurors: "[I]s there anyone amongst you who because of religious, ethical, philosophical or whatever reason, could not, could not, impose the death penalty in an appropriate case of murder of the first degree?" N.T., 9/22/92, at 90–91. From the first panel questioned by the trial court, 16 individuals raised their hands and the trial court excused them. The process continued for a second and third panel of venirepersons, with the trial court asking a similar question to each panel and which resulted in 17 more individuals being excused.

Appellant points to *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), for the proposition that insufficient questioning of venirepersons' death penalty views frustrates appellate review of whether the trial court erred in its assessment of whether individuals were properly removed for cause. According to Appellant, the "raise-your-hand" approach employed by the trial court *sub judice* did not allow the trial court to assess the sincerity or credibility of each venireperson it excused and precludes our Court from meaningful appellate review. Moreover, Appellant warns that this

practice would "give license to other trial courts to follow the same or a similarly constitutionally deficient practice and would inhibit meaningful appellate review of jury selection." Appellant's Brief at 55.

Furthermore, as this issue is raised as a claim of ineffective assistance of counsel, Appellant offers that trial counsel failed to object to this process both when the trial court initially proposed the procedure and when the trial court afforded him the opportunity to do so. Appellant states that, "Defense counsel could not have had a reasonable basis for consenting to the trial court's flawed death-qualification procedure, and his failure to object constitutes ineffectiveness." Appellant's Brief at 57. Finally, according to Appellant, trial counsel's failure to object prejudiced him in terms of his right to an impartial jury of his peers and the improper removal of even one venireperson requires a new sentencing proceeding. *Gray*, 481 U.S. at 668, 107 S.Ct. 2045.

The Commonwealth responds by asserting that Appellant waived his claim of trial court error as trial counsel failed to challenge the trial court's *voir dire* procedure. Related thereto, the Commonwealth contends that Appellant's claim of appellate counsel ineffectiveness fails because, *inter alia,* he did not establish that trial counsel lacked a reasonable basis for his actions. As to the merits of Appellant's challenge, the Commonwealth argues that the trial court acted properly, as the jurors who answered the question of who, because of religious, ethical, philosophical, or other reason, "could not, could not" impose the death sentence in an appropriate case, expressed their inability to impose a capital sentence and, thus, were properly dismissed under relevant decisional law.

Initially, we note that the PCRA court found this issue to have been previously litigated. This determination was in error. Specifically, on direct appeal, we did not decide a challenge to the trial court's death qualification of the jury, but rather, merely noted that some version of the procedure occurred in the context of addressing and resolving Appellant's challenge to counsel's failure to adequately "life qualify" the jury. *Dennis I,* 715 A.2d at 411. Our review of the

Appellant's direct appeal brief confirms that appellate counsel challenged only the lack of a life qualification effort by trial counsel, not the failure to object to the death-qualification procedure. Thus, this issue was not previously litigated.

As to the substance of this ineffectiveness claim, here the individuals removed from the venire did not indicate just a general objection to the death penalty or some misgivings about the imposition of the death penalty, but rather answered the trial court's inquiry by responding that they "could not, could not" apply a death sentence even in an appropriate case. Appellant does not analyze this issue in any depth and fails to cite any decisions from our Commonwealth. Furthermore, the question of whether a single question, "raise-your-hand" approach passes constitutional muster has not been directly addressed by the United States Supreme Court or our Court. *Compare Uttecht,* 127 S.Ct. at 2224 (emphasizing at least in individual *voir dire* process that a trial court is to make a judgment regarding substantial impairment based in critical part on demeanor of the venire and of the individuals who compose it, and the deference to be paid to that determination) *and Gray,* 481 U.S. at 663, 107 S.Ct. 2045 (opining that inadequate questioning regarding venire members' views precludes clarification of positions and effective appellate review) *with Commonwealth v. Cox,* 556 Pa. 368, 728 A.2d 923, 929–30 (1999) (finding that trial court exercised its discretion properly when it dismissed certain potential jurors for cause who answered two or more of four questions positively regarding following the law; religious, moral or conscientious reason against voting for death penalty; following court's instructions; and the inability to impose the death penalty no matter the circumstances without further questioning) *and Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441, 446 (1997) (concluding that use of answers to specific questions on a juror questionnaire without individual *voir dire* was not improper as the dismissed jurors indicated "that they had personal views that prevented them from imposing a sentence of death or life imprisonment when the law and facts required the same"). We need not decide the underlying merits of Appellant's claim,

however, as we find that he has failed to establish that trial counsel had no reasonable basis for failing to object to the trial court's *voir dire* procedure.

Specifically, in his brief to our Court, and without citation to record, Appellant makes only a bald assertion that trial counsel, "could not have had a reasonable basis" for consenting to the trial court's approach. Appellant's Brief at 57. Moreover, our independent review of the record reveals that while trial counsel offered an unsworn "Declaration and Affidavit" at the evidentiary hearing before the PCRA court, it merely sets forth a generic two sentence assertion that trial counsel did not object to the death-qualification process and did not "recall having any trial strategy for failing to object [to the court's death qualification]." Declaration and Affidavit of Lee Mandell Pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S.A. § 4904, Exhibit 5, at 11. The declaration contains no other statements regarding the specifics of the precise claim raised before us.[27] Finally, and related thereto, while PCRA counsel made some initial effort based upon the declaration to adduce from trial counsel his basis, or lack of basis, for declining to challenge the court's chosen death qualification procedure at the evidentiary hearing before the PCRA court, he failed to engage in any inquiry regarding trial counsel's strategy in this regard. Specifically, in response to counsel's inquiry concerning wheth-

**27.** Even if the unsworn declaration fully addressed the specific claim of alleged trial court error, it appears that such a document standing alone would be insufficient to establish the reasonable basis prong. *Compare Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139, 1148 (2005) (assuming truth of unsworn "Declaration/Affidavit," but finding such document to be improperly characterized as an "affidavit" because not sworn to by the declarant before an officer authorized to administer oaths); *and id.* at 1168–70 (Castille, J., concurring) (opining that absent assurances, "out of court witness 'declarations' have little to distinguish them from other hearsay or irrelevant chatter" and are insufficient to prove the ultimate merit of a claim); *and id.* at 1176 (Saylor, J., dissenting) (offering that in circumstances "in which affidavits, declarations, or similar evidentiary proffers are presented to a PCRA court which, if believed, would bring the reliability of the death verdict into legitimate question, a post-conviction hearing and associated fact-finding are required"); *with id.* at 1170 n. 1 (Nigro, J., dissenting) (concluding that declarations of trial and associate counsel establish trial counsel's ineffectiveness as a matter of law and negate necessity for evidentiary hearing).

er trial counsel "recall[ed] any trial strategy for failing to object to the death qualification," trial counsel responded with a question of his own: "When you say 'death qualification,' you'll need to clarify that for me." N.T., 5/5/05, at 197. An exchange followed among PCRA counsel, the prosecution, and the court, after which trial counsel never responded to this inquiry. Thus, PCRA counsel did not avail himself of the opportunity to ask any specific questions regarding the nature of the allegedly deficient death-qualification process, trial counsel's understanding of that allegation, or trial counsel's lack of action regarding the same.

In light of the above, we find that Appellant has made merely a perfunctory attempt to establish the lack of a reasonable basis for trial counsel's actions and, thus, has failed meet his burden of proving that trial counsel's omission in failing to object to this specific *voir dire* process employed by the trial court could have no reasonable basis. As we find Appellant failed to prove that trial counsel was not ineffective, Appellant's claim of appellate counsel's ineffectiveness necessarily falls, and he is not entitled to relief.

▆▆▆▆ Appellant next challenges the trial court's death-qualification procedure by asserting, in a cursory argument, that the trial court's instructions permitted jurors to be excluded when they only "might" not have been able to impose a death sentence. Specifically, Appellant points to the trial court's instruction to the second panel of jurors in which he asked potential jurors to raise their hands "if any of those questions apply to you or you think they might apply to you." N.T., 9/24/92, at 8. According to Appellant, this statement was in error. Appellant suggests that this instruction led to the removal of prospective jurors who only "might" not be able to impose the death penalty. Thus, he contends, the trial court failed to explore whether the excused venirepersons were able to set aside their potential disinclination to the death penalty.

The Commonwealth counters that these individuals were asked if any of them "could not, could not impose the death penalty in an appropriate case under the evidence and the

law." According to the Commonwealth, a venireperson who could impose a capital sentence under some circumstance would not have declared that he "could not, could not" impose a capital sentence under any circumstance simply because the court's instruction "might" apply to him.

For the reasons offered above, in addition to the fact that Appellant makes no assertion regarding trial counsel's strategy regarding this issue, Appellant has failed to meet his burden of establishing that trial counsel had no reasonable basis for failing to object to this instruction. Therefore, Appellant's claim of appellate counsel's ineffectiveness has not been established and he is not entitled to relief.

■■■ Finally, Appellant maintains that the trial court engaged in constitutional error when it excused a venireperson based solely on her religious views, without ascertaining her ability to follow the law. At trial, juror number 25 noted that she was a studying Jehovah Witness. After informing the trial court of her religion, Juror 25 stated that "I don't believe my conscience will allow me to sit in judgment of someone." N.T., 9/23/92, at 6. The trial court dismissed her without further questions. Appellant contends that the trial court erred in failing to "develop evidence that demonstrated that [Juror 25] was unable to set aside her religious views." Appellant's Brief at 56.

The Commonwealth responds that Appellant is not entitled to relief because, *inter alia,* this claim was not raised in his PCRA petition and Appellant did not ask trial counsel any questions regarding this juror at the evidentiary hearing and did not call this juror to testify.

We agree with the Commonwealth that Appellant has failed to meet his burden of proving that trial counsel had no reasonable strategy for failing to object to the dismissal of this juror; *a fortiori,* he cannot establish appellate counsel's ineffectiveness. This is especially true here, where both trial counsel and the trial court had the opportunity to assess the demeanor of Juror 25. *Uttecht,* 127 S.Ct. at 2224 (explaining the deference to be accorded to the trial court due in part to

its position to assess the demeanor, attitude, and qualifications of the individuals who comprise the venire and noting the importance of even non-verbal communications). No questions were asked of trial counsel regarding the nature of this claim. Therefore, we find that Appellant is not entitled to relief on his three challenges regarding the death qualification of venirepersons at his trial.

### (b) Trial Counsel's Failure to "Life Qualify" the Jury

In a related challenge, Appellant maintains that trial counsel was ineffective for failing to "life qualify" the jury. As noted above, " 'Life qualification' is the process by which prospective jurors are excluded from the jury based on their fixed opinion that the death penalty must be imposed for a first degree murder conviction." *Speight*, 854 A.2d at 459 (citation omitted). In *Speight*, we observed that "trial counsel is not ineffective for failing to life qualify a jury so long as the jury selection process is otherwise fair and impartial." *Id.* (citation omitted). Appellant contends that the PCRA court erred in finding this claim previously litigated, because, while on direct appeal appellate counsel failed to present any evidence in support of the claim that any juror was predisposed automatically to impose the death penalty in the event of a guilty verdict, before the PCRA court he produced an affidavit in which one of his jurors claimed to have felt bound to impose the death penalty upon convicting Appellant of murder.

On direct appeal, regarding this issue, we rejected Appellant's claims on the basis that Appellant had failed even to attempt to meet his burden to demonstrate that one or more of the impaneled jurors would automatically impose the death penalty. *Dennis I*, 715 A.2d at 411. Thus, the Commonwealth responds, echoing the PCRA court, that this claim is previously litigated and therefore not cognizable on collateral review. The Commonwealth also argues that Appellant fails properly to layer his claim before this Court, where the dictates of *McGill* undisputedly apply.

Far more material, however, is the Commonwealth's response on the merits that the affidavit does not reveal that the

juror had any improper predisposition, at the time of jury selection, to find in favor of the death penalty as a matter of course upon returning a verdict of guilty of murder, and that it is only jurors with this predisposition that "life qualification" aims to root out and exclude for cause. In the affidavit, the juror in question asserted as follows: "My understanding during sentencing deliberations was that because we found Mr. Dennis guilty of murder, our only sentencing option was to sentence Mr. Dennis to death. I believed the options were either not guilty or guilty and we must sentence Mr. Dennis to death." Declaration and Affidavit of Juror, Appendix to Initial Brief of Appellant, Exh.34.

We fail to see how this declaration, while manifesting a troubling degree of confusion regarding the juror's duty in sentencing, manifests the sort of predisposition life qualification aims to identify. Moreover, the Commonwealth duly notes that the jury repeatedly was told that the death sentence was not mandatory upon a guilty verdict of murder. Specifically, during the juror's individual *voir dire*, the Commonwealth emphasized that, if the jury convicted Appellant of first-degree murder, the Commonwealth would "ask the jury to consider imposing the death penalty." Brief for Appellee at 80 (quoting N.T., 9/25/92, at 34). Similarly, during the jury charge for sentencing, the court informed jurors that their task was to "decide whether to sentence the defendant to death or life imprisonment." *Id.* at 81 (quoting N.T., 10/19/92, at 126). This was a point to which the court returned, implicitly and explicitly, repeatedly during the sentencing charge.

Despite our displeasure with the PCRA court's failure to analyze this claim anew, or to explain clearly why the issue was not cognizable, we agree with the Commonwealth that Appellant's showing in this regard no more satisfied the requirements of the law than did his claims when originally presented on direct review. Accordingly, we affirm on that basis.

### 6. The Lack of a Jury Instruction Under *Simmons* *v. South Carolina*, 512 U.S. 154 (1994)

In his final discrete substantive issue, Appellant contends that, the Commonwealth having put Appellant's future dangerousness in issue during the course of trial, trial counsel was ineffective for failing to seek an instruction that a life sentence means life without parole pursuant to the United States Supreme Court's plurality decision in *Simmons*, and appellate counsel was ineffective for failing to raise this issue on direct appeal. Appellant, relying principally on a federal district court case, *see Bronshtein v. Horn*, 2001 WL 767593 (E.D.Pa. July 5, 2001), argues that future dangerousness can be put in issue either "evocatively" or "explicitly," and contends that the Commonwealth did both in this case. Appellant contends that, in effect, the prosecutor at trial exhorted the jury to protect the community and prevent Appellant from committing future crimes. He cites the prosecutor's arguments that "[Appellant] will be done when you say he is done," his suggestion that jurors "think of [their] community," N.T., 10/15/92 at 104, and his urging jurors to "[d]o the right thing and stop Jimmy Dennis, stop him cold." N.T., 10/19/92, at 106, 109 (respectively). Regarding the effect of these arguments in conjunction with the absence of a *Simmons* instruction, Appellant directs our attention to the affidavits of two different jurors, each of whom attested that they believed that had they sentenced Appellant to life in prison, he could or would have been released from prison after a number of years.

Appellant acknowledges that *Simmons* had not been decided until after his trial, and hence was not the law at the relevant time. It was decided, however, well before Appellant's conviction became final upon the expiration of the time period for appealing this Court's adverse ruling on direct appeal to the United States Supreme Court in 1998. Appellant's only effort to argue that the *Simmons* rule would have applied on direct appeal, notwithstanding its issuance after entry of his verdict of guilty and his death sentence, is to cite the United States Supreme Court's decision in *Beard v.*

*Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004),[28] regarding the governing standard for the application of new rules of criminal procedure to cases pending collateral review, and to assert that, while the state of the law at trial did not include the *Simmons* rule, such "is not dispositive." Brief for Appellant at 62.

■ The Commonwealth raises several colorable arguments against any grant of relief on this basis, but one suffices. As the Commonwealth notes, in *O'Dell v. Netherland,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997), the Court determined that its ruling in *Simmons* amounted to a "new" rule for purposes of retroactivity analysis. *O'Dell* clarified that, under the rule discussed in *Beard,* the court must inquire "whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." 521 U.S. at 156, 117 S.Ct. 1969 (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)). Even more apposite to this case is this Court's recent decision in *Rios,* in which we declined to find appellate counsel ineffective for failing to raise trial counsel ineffectiveness as to an issue that trial counsel simply could not have been expected to pursue below, given the state of the law during trial. *See Rios,* 920 A.2d at 820.[29]

28. In *Beard,* the Supreme Court reiterated the constitutional test regarding how to determine whether a rule of criminal procedure applies to cases pending collateral review. First, the court must determine when the conviction became final. Second, the court must determine the legal landscape as it then existed, and whether the constitution actually compelled the rule—that is, whether the rule is "new." Third, if the rule is new, the court must determine whether it falls within either of two enumerated exceptions to the presumption of nonretroactivity that attaches to "new" constitutional rules. *Beard,* 542 U.S. at 411, 124 S.Ct. 2504.

29. In this case, the Commonwealth observes, not only would the trial court not have felt compelled so to rule, but indeed, under then-valid Pennsylvania law, the court was expressly precluded from providing a *Simmons*-like instruction. *See, e.g., Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 901 (1999) (citing *Commonwealth v. Edwards,* 521 Pa. 134, 555 A.2d 818, 830–31 (1989) and noting that, prior to *Simmons,* Pennsylvania courts were prohibited from issuing a life-means-life instruction).

As in *Rios* and *Porter*, we will not hold trial counsel ineffective for failing to anticipate a change in the law, and where trial counsel is not ineffective appellate counsel cannot be ineffective. Accordingly, Appellant's argument in this regard must fail.

### 7. *The Cumulative Effect of Counsel's Ineffective Stewardship*

Finally, Appellant contends that even where individual assertions of ineffective assistance of counsel are rejected for one reason or another, aggregated with each other they may add up to a violation of his constitutional rights. We consistently have rejected such claims, holding that "no number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 948 (2001) (quoting *Commonwealth v. Craig Williams*, 532 Pa. 265, 615 A.2d 716, 722 (1992)). Therefore, Appellant is entitled to no relief on this contention.[30]

## III. CONCLUSION

Having exhausted Appellant's arguments on appeal of the PCRA court's denial of his petitions under the PCRA to the

**30.** In connection with this argument, Appellant also seeks to relitigate, under the rubric of evidence withheld by the prosecution, trial counsel's failure adequately to investigate witness Latanya Cason. Brief for Appellant at 42–43. Appellant contends that Cason misread the "military" time stamp on her Department of Public Works welfare check receipt, which read 13:03, and believed that this meant 3:03 rather than 1:03 and, accordingly, calibrated her memory of events that day two hours ahead of their actual occurrence. Appellant does not even endeavor to claim after-discovered evidence, or to identify ineffectiveness on the part of appellate counsel, basing his present argument precisely on the same time-stamped receipt he brought before this Court on direct appeal, which, he continues to argue, discredits her testimony that she saw Appellant more than two hours after the shooting only four miles away, and suggests instead that she overestimated the time by approximately two hours and therefore in fact saw Appellant four miles from the murder scene between 2:00 and 2:30 P.M. We rejected this argument in essentially its current form on direct appeal, *Dennis I*, 715 A.2d at 408 (finding the proffered evidence insufficient to establish alibi, cumulative of other testimony at best, and the receipt on which it was putatively based not subject to *Brady* disclosure), and the claim therefore is previously litigated.

extent possible on the record now before us, it remains only to identify those issues as to which we must direct a remand. At a minimum, to draft an opinion sufficiently complete to enable meaningful appellate review, the PCRA court is directed to:

(1) consider Appellant's claim that trial counsel was ineffective for failing to investigate Anissa Bane and that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness in this regard; and

(2) review Appellant's claims that the Commonwealth suppressed, in violation of *Brady,* material exculpatory evidence in the form of the police activity sheet, or the contents thereof, in which Mannasett Pugh and Diane Pugh allegedly provided information that could impeach the testimony of Zahra Howard, one of the Commonwealth's three eyewitnesses at trial.

For the foregoing reasons, and as outlined above, the PCRA court's order denying all of Appellant's claims under the PCRA is vacated in the outlined regards, affirmed in all other regards, and the case is remanded for further proceedings consistent with this Opinion. While the peculiarities endemic to each issue subject to this remand order are contained within their respective discussions, broadly, we make clear our continued reliance on the PCRA court, in its discretion, to evaluate as necessary questions of waiver and the adequacy of the record and argument with respect to each issue, to consider afresh the necessity of permitting Appellant to amend his pleadings as discussed in *McGill,* and to hold further evidentiary hearings, if necessary, on the issues. We ask that the court, in whatever it decides, provide this Court with sufficient explanation of its bases for so ruling, including findings of fact where necessary and conclusions of law, to facilitate meaningful appellate review.

Case REMANDED. Jurisdiction RETAINED.

Chief Justice CASTILLE and Justices SAYLOR, EAKIN, BAER and McCAFFERY join the opinion.