J-S24030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JERMAINE MICHAEL JACKSON | : | |
| | : | |
| Appellant | : | No. 3540 EDA 2018 |

Appeal from the PCRA Order Entered November 15, 2018
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0003598-2012

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:               **FILED JULY 10, 2019**

Jermaine Michael Jackson appeals from the order denying his petition for relief filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Jackson asserts his trial counsel was ineffective for failing to properly meet with Jackson in preparation for trial and for failing to present alibi witnesses at trial. We affirm on the basis of the PCRA court's opinion.

In 2013, a jury convicted Jackson of second-degree murder, conspiracy to commit criminal homicide, robbery, and conspiracy to commit burglary.[1] The trial court sentenced Jackson to life imprisonment on the murder conviction, and a concurrent term of 10 to 20 years' imprisonment on the conspiracy to commit robbery charge. The court imposed no further penalty on the remaining convictions. This Court affirmed Jackson's judgment of

---

[1]18 Pa.C.S.A. §§ 2502(b), 903(c), 3701(a)(1)(i), and 903(c), respectively.

*   Former Justice specially assigned to the Superior Court.

sentence on April 7, 2016 and our Supreme Court denied Allowance of Appeal in August 2016. In July 2017, Jackson, *pro se*, filed the instant timely PCRA petition. The trial court appointed counsel, who filed an amended petition.

The PCRA court held a hearing in September 2018, at which trial counsel testified that he had met with Jackson, at the Northhampton County Correctional Facility, on a weekly basis between April and September of 2012. Further, even after he was no longer being paid, trial counsel met with Jackson another 15 to 20 times between October 2012 and the start of trial in May 2013. Trial counsel further indicated that he felt in person communication was more effective than phone calls or letters in this particular case. Trial counsel also testified regarding his strategic decision not to present the testimony of alibi witnesses because Jackson admitted he had been at the scene of the murder and corroborating evidence placed him there. The PCRA court denied relief.

The PCRA court's opinion recounts the evidence presented at Jackson's trial, and we need not restate it here. **See** PCRA Court Opinion, filed 1/22/19, at 1-4 (quoting Tr. Ct. Opinion, 3/17/15). Suffice it to say, that cell phone records and cooperating witnesses placed Jackson at the scene of the victim's murder at the time of the crime. However, Jackson claims that trial counsel was ineffective for failing to adequately prepare for trial and by failing to present alibi witnesses.

On appeal, Jackson presents the following issues for our review:

- 2 -

    A. Did the PCRA court properly deny [Jackson's] claim that trial counsel was ineffective for failing to "properly" prepare him for trial and/or consult with him and personally meet with him?

    B. Did the PCRA court properly deny [Jackson's] claim that counsel was ineffective for failing to advise him and discuss with him the fact that counsel would not present an alibi defense at trial?

Jackson's Br. at 1.

Our review of the denial of PCRA relief "is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level." ***Commonwealth v. Medina***, 92 A.3d 1210, 1214 (Pa.Super. 2014) (*en banc*) (quoting ***Commonwealth v. Koehler***, 36 A.3d 121, 131 (Pa. 2012)). We are bound by any credibility determinations made by the PCRA court and supported by the record, but apply a *de novo* standard of review to the PCRA court's legal conclusions. ***Id.*** at 1214-15.

"Counsel is presumed effective, and [a petitioner] has the burden of proving otherwise." ***Commonwealth v. Brown***, 161 A.3d 960, 965 (Pa.Super. 2017). To overcome this presumption, a petitioner must plead and prove that: "(1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness." ***Commonwealth v. Paddy***, 15 A.3d 431, 442 (Pa. 2011) (citation omitted). Specifically, the volume and length of consultations a trial counsel has with a client prior to trial cannot serve as the sole factor considered in an ineffective assistance of

counsel determination. ***Commonwealth v. Johnson***, 51 A.3d 237, 244 (Pa.Super. 2012) (*en banc*).

Furthermore, when an ineffectiveness claim is premised on counsel's failure to present a witness, the petitioner must demonstrate that: "(1) the witness existed; (2) counsel was either aware of or should have been aware of the witness's existence; (3) the witness was willing and able to cooperate on behalf of the defendant; and (4) the proposed testimony was necessary to avoid prejudice to the defendant." ***Commonwealth v. Tharp***, 101 A.3d 736, 757 (Pa. 2014) (quoting ***Commonwealth v. Bryant***, 855 A.2d 726, 746 (Pa. 2004)). To establish prejudice, a petitioner must prove that "there is a reasonable probability that the outcome of the proceedings would have been different had counsel not been ineffective in the relevant regard." ***Commonwealth v. Dennis***, 950 A.2d 945, 954 (Pa. 2008). Failing to satisfy even one of these factors requires this Court to reject the ineffectiveness claim. ***Id.***

In its Rule 1925(a) opinion, the PCRA court explained that Jackson's claim that trial counsel failed to adequately prepare for trial is baseless. Not only did trial counsel consistently meet with Jackson, Jackson could not provide any credible examples of where any lack of preparation by trial counsel negatively affected his case. ***See*** PCRA Ct. Op. at 8-10. Further, the PCRA court aptly determined that trial counsel had a credible strategic basis for concluding that alibi witnesses would not be helpful to Jackson's defense. Specifically, the PCRA court noted that police interviews revealed that the

proposed witnesses would not have furthered an alibi defense and corroborating witnesses and cell phone records placed Jackson at the scene of the crime. *See id.* at 10-12.

After a review of the parties' briefs, the certified record, and the relevant law, we find no abuse of discretion or error in the PCRA court's analysis. We thus affirm on the basis of the well-reasoned opinion of the Honorable Rea B. Boylan, which we adopt and incorporate herein. *See* PCRA Ct. Op. at 6-12.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/19

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA
                        :
                        :
                        :        No. CP-09-CR-0003598-2012

v.                       :
                        :

JERMAINE MICHAEL JACKSON   :

## OPINION

Defendant Jermaine Michael Jackson ("Appellant") appeals this Court's dismissal of his petition pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541, *et seq.*, on November 15, 2018. We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

### I.    FACTUAL BACKGROUND

Following a jury trial, Appellant was convicted of Second Degree Murder,[1] Conspiracy to Commit Criminal Homicide,[2] Robbery,[3] and Conspiracy to Commit Burglary[4] on May 20, 2013. The following is a summary of the relevant facts, which this Court set forth in its Opinion, filed on March 17, 2015:

> On December 28, 2011, at approximately 10:00 p.m., Officer Douglas Slemmer of the Bristol Township Police Department responded to a call regarding a shooting at 17 Crabtree Lane in Levittown. N.T. 5/14/13, p. 192. Officer Slemmer discovered the victim, Danny DeGennaro, deceased and bleeding from the chest in the home's entryway. N.T. 5/14/13, pp. 197, 202. Only Mr. DeGennaro and his roommate, James Meszaros, were home at the time. N.T. 5/14/13, p. 102. Mr. Meszaros testified at trial that he went downstairs to go to the bathroom, and when he returned, he saw Mr. DeGennaro walking towards him in the vestibule. N.T. 5/14/13, p. 103. Mr. DeGennaro said "here we go," then his eyes rolled up in his head, he fell backwards, and Mr. Meszaros tried to catch him. N.T. 5/14/13, p. 103. Mr. Meszaros did not see what preceded the shooting. N.T. 5/14/13, pp. 102-104. When Mr. DeGennaro fell to the ground, Mr. Meszaros ran to seek help from his neighbor, Nick Wilson. N.T. 5/14/13, p. 104. Mr. Wilson called 911, then tried to stuff t-shirts into Mr. DeGennaro's shotgun wound to stop

---

[1] 18 Pa. C.S.A. § 2502(b).
[2] 18 Pa. C.S.A. § 90(c).
[3] 18 Pa. C.S.A. § 3701(a)(1)(i).
[4] 18 Pa. C.S.A. § 903(c).

1





the bleeding. N.T. 5/14/13, p. 111. Officer Slemmer testified that the shotgun wound was about two to three inches in diameter and that it was "bleeding profusely." N.T. 5/14/13, p. 199.

Officer Slemmer saw no signs of forced entry. N.T. 5/14/13, p. 205. He observed a large amount of blood was on the stairs, walls, and floor of the vestibule. N.T. 5/14/13, p. 197. The kitchen area also had a great deal of blood. N.T. 5/14/13, p. 204. Detective Timothy Furhmann, who also investigated the scene that night, found a bullet case, shotgun wadding, and plastic sheathing from a shotgun shell in the kitchen. N.T. 5/14/13, p. 251. Detective Furhmann discovered a bullet hole in a wall in the living room. N.T. 5/14/13, p. 256. Furthermore, tire tracks were located in the grass behind the house. N.T. 5/14/13, p. 267. Bullet holes were later found in the shirts Mr. DeGennaro was wearing and his chest had over eighty-six shotgun pellets inside of it. N.T. 5/14/13, pp. 313, 317; N.T. 5/15/13, p. 18.

Dr. Erica Williams, a forensic pathologist, opined that Mr. DeGennaro's death was a homicide caused by a shot fired from about a three foot range. N.T. 5/15/13, pp. 27, 33. She testified that the blast injured Mr. DeGennaro's skin, ribs, pericardium, heart, right lung, diaphragm, and liver. N.T. 5/15/13, p. 17. Mr. DeGennaro lost a "significant" amount of blood and it was unlikely that he could have survived the shotgun wound. N.T. 5/15/13, p. 26.

Prior to the shooting, Mr. Wilson parked his Volkswagen behind Mr. DeGennaro's house with a for sale sign. N.T. 5/15/13, p. 61. During the investigation, Mr. Wilson reported to Detective Gregory Beidler that he received a call at 9:30 on the evening of the shooting regarding the vehicle, and he provided the detective with the incoming cell phone number, (267) 304-4103. N.T. 5/15/13, p. 61. Detective Beidler obtained the subscriber information from T-Mobile and determined that the number belonged to Dakita Boone and the phone was used by her daughter, Tatyana Henderson. N.T. 5/15/13, pp. 62-63. The T-Mobile records also showed that Ms. Henderson was about 300 yards from Mr. DeGennaro's house when she called Mr. Wilson on December 28, 2011. N.T. 5/15/13, p. 66. The records also revealed that a number belonging to Danasia Bakr sent several texts to Ms. Henderson on the night of the shooting, including a text at 5:39 p.m. that said "can we do that thing wit Jermaine." N.T. 5/15/13, p. 76. Ms. Henderson texted Ms. Bakr the next day as well, saying "going outside to talk to Jermaine just in case." N.T. 5/15/13, p. 77. Ms. Henderson's phone records also showed that she made many calls to a number belonging to the Appellant. N.T. 5/15/13, pp. 80.

Records for the Appellant's phone number showed five calls to and from numbers belonging to Breon Powell and Kazair Gist just minutes after the shooting. N.T. 5/15/13, pp. 106-107. The records for all five individuals showed that their phones were in the area of Mr. DeGennaro's house at the time of the shooting and that they exchanged multiple calls and text messages that evening. N.T. 5/15/13, p. 111, 117-122. Significantly, immediately after the shooting at approximately 10:00 p.m., Ms. Bakr and Mr. Powell called the Appellant multiple times. N.T. 5/15/13, p. 125.

On February 13, 2012, Superior Court Judge Paula Francisco Ott approved a hard wire for the cell phones belonging to Ms. Bakr, Ms. Henderson, and the Appellant. N.T. 5/15/13, p. 135. Based on the wire interceptions, Ms. Bakr was subpoenaed to testify before a grand jury on March 8, 2012. N.T. 5/16/13, p. 41. Prior to her testimony, Ms. Bakr gave an interview to the

2

Bucks County Detectives in which she implicated herself, Ms. Henderson, the Appellant, Mr. Powell, and Mr. Gist in the killing of Mr. DeGennaro. N.T. 5/16/13, p. 45. On March 29, 2012, the Appellant was arrested in connection with the murder of Mr. DeGennaro. N.T. 5/16/13, pp. 49-50.

At trial, Ms. Bakr testified that she acted as the get-away driver. N.T. 5/16/13, p. 108. On the day of the shooting, she and Ms. Henderson agreed to help the Appellant rob someone who owed him money for drugs. N.T. 5/16/13, p. 115. Ms. Bakr and Ms. Henderson met the Appellant, Mr. Powell, and Mr. Gist at a parking lot in Trenton. N.T. 5/16/13, pp. 118-119. Mr. Powell placed a gym bag in Ms. Bakr's trunk and instructed Ms. Bakr to follow the three men, who were in Mr. Powell's car. N.T. 5/16/13, p. 122. The plan was for the Appellant to go into the target's house to get the money and if the target did not cooperate, Mr. Powell was to go into the house to hold the target at gunpoint. N.T. 5/16/13, pp. 124-125. Ms. Bakr understood the Appellant to be in charge of what they were going to do that night. N.T. 5/16/13, p. 124.

They drove the two vehicles aimlessly for some time, then headed towards the Crabtree neighborhood in Levittown, at which point the Appellant got into Ms. Bakr's vehicle. N.T. 5/16/13, pp. 127-130. The Appellant directed Ms. Bakr to pull up to Mr. DeGennaro's house and Ms. Henderson to "call about the car," the Volkswagen that was parked behind Mr. DeGennaro's house. N.T. 5/16/13, pp. 135-136. As they sat in the car, Ms. Bakr could see two men inside Mr. DeGennaro's house. N.T. 5/16/13, p. 139. The Appellant wanted Ms. Henderson to call regarding the car so he could see if either of the men would answer. N.T. 5/16/13, p. 139. Ms. Henderson made the call at approximately 9:00 p.m. and was told she could test drive the car the next day. N.T. 5/16/13, pp. 140, 143.

After the phone call, the five drove around the neighborhood and stopped at another location. N.T. 5/16/13, pp. 144, 146. There, the Appellant and Mr. Powell got out of the cars and Mr. Powell asked Ms. Bakr to pop her trunk. N.T. 5/16/13, pp. 144, 146. Both men were wearing gloves and had their faces covered. N.T. 5/16/13, pp. 148-149. The Appellant and Mr. Powell walked "around the corner" and Ms. Bakr could not see them anymore. N.T. 5/16/13, p. 151. Ms. Henderson was on the phone with the Appellant for about a minute after the two men disappeared. N.T. 5/16/13, pp. 154-155.

Five minutes later, Ms. Bakr heard a noise that sounded like a shotgun. N.T. 5/16/13, pp. 153, 155-156. Ms. Bakr began to drive away, but Mr. Powell and Mr. Gist then ran to Ms. Bakr's vehicle and Mr. Powell pounded on her trunk, so she slowed her car down and let the two men into her car. N.T. 5/16/13, pp. 157-158. Ms. Bakr noticed that Mr. Gist also had his face covered and was wearing gloves. N.T. 5/16/13, pp. 159-160. According to Ms. Bakr, Mr. Powell and Mr. Gist seemed "jumpy." N.T. 5/16/13, pp. 164. Mr. Powell stated "I had to do it, son" and Mr. Gist said "I shot him too." N.T. 5/16/13, pp. 164. They instructed Ms. Bakr to drive away and she did. N.T. 5/16/13, pp. 164-165. As they drove away, Mr. Powell was on the phone with Mr. Jackson. N.T. 5/16/13, p. 166. They met the Appellant back at the parking lot in Trenton, where Mr. Powell got out of the car, removed a shotgun from his pants, and put it back in the gym bag that he placed in Ms. Bakr's trunk. N.T. 5/16/13, pp. 167, 169. The Appellant got into Ms. Bakr's car, where he informed Ms. Bakr and Ms. Henderson that "it wasn't meant to happen this way," and he advised the two women not to say anything to

3

anyone. N.T. 5/16/13, p. 169-170. The Appellant then got into the other car with Mr. Powell and Mr. Gist and they all drove away. N.T. 5/16/13, p. 171. Ms. Bakr testified that after that night, the Appellant remained in charge of the situation and told each of them what to do. N.T. 5/16/13, p. 183.

At trial, Ms. Henderson testified that on December 27, 2011, the Appellant asked her to get Ms. Bakr's car so that she could take him to Pennsylvania to "get money" from someone who owed him money. N.T. 5/17/13, p. 46-48. On December 28, 2011, Ms. Henderson sent Ms. Bakr a text message asking her if she was ready to go do "that thing with Jermaine." N.T. 5/17/13, p. 50. Ms. Bakr then drove the two women to a parking lot in Trenton to meet the Appellant, Mr. Powell, and Mr. Gist. N.T. 5/17/13, pp. 52-53. Mr. Powell approached Ms. Bakr's vehicle with a gym bag and asked if he could put it in Ms. Bakr's trunk. N.T. 5/17/13, pp. 54-55. The Appellant told the women that they should follow him to Pennsylvania and wait in the car while the men went to get the money. N.T. 5/17/13, p. 56. He also told them that that if the man didn't give them the money, Mr. Powell and Mr. Gist were there to "make sure he got his money." N.T. 5/17/13, p. 56.

They drove two cars to Levittown, and the Appellant told Ms. Bakr to pull over near a house with a Volkswagen parked outside. N.T. 5/17/13, pp. 62-66. The Appellant asked Ms. Henderson to call the number on the for sale sign to see if "the guy" would answer. N.T. 5/17/13, p. 68. A man answered the phone and Ms. Henderson asked a few questions about the car. N.T. 5/17/13, p. 69. Ms. Henderson could see two men inside the house, and the Appellant told her one of the men was the one who owed him money. N.T. 5/17/13, p. 70.

They drove around the neighborhood for approximately thirty more minutes, and then pulled up to the same house. N.T. 5/17/13, p. 72. The men got out of the car, Mr. Powell removed the gym bag from Ms. Bakr's car, and the three men approached the house. N.T. 5/17/13, pp. 72-75. The Appellant called Ms. Henderson and asked her to stay on the phone with him while they went inside. N.T. 5/17/13, p. 73. After about a minute, Ms. Henderson heard the Appellant say "go ahead," and about a minute later, she heard two gunshots. N.T. 5/17/13, p. 76. Mr. Powell and Mr. Gist ran back to the car and banged on the trunk for Ms. Bakr to open it, and then got in the car. N.T. 5/17/13, p. 77. Mr. Powell yelled that he "shot the guy" and Mr. Gist said that he shot him too. N.T. 5/17/13, p. 79. They all drove back to the parking lot in Trenton, where the men argued because the Appellant was angry that they did not get any money. N.T. 5/17/13, p. 82. The Appellant then advised everyone not to say anything about what happened to anyone, and they all went home. N.T. 5/17/13, p. 85.

Trial Ct. Op., March 17, 2015.

4

## II.   **PROCEDURAL HISTORY**

On May 20, 2013, Appellant was found guilty of Second Degree Murder,[5] Conspiracy to Commit Criminal Homicide,[6] Robbery,[7] and Conspiracy to Commit Burglary[8] following a jury trial. This Court sentenced Appellant to life imprisonment on May 23, 2013. Appellant timely appealed, arguing that this Court erred (1) by not sustaining objections and declaring a mistrial following objections to the prosecutor's use of PowerPoint slides during the closing argument that were "manipulated to present unduly inflammatory images that were not in evidence," (2) by not suppressing evidence of mobile phone usage obtained through the use of grand jury subpoenas that were issued without affidavits, and (3) by admitting unfairly inflammatory evidence of Appellant's presence at a shooting range. *See Commonwealth v. Jackson*, No. 1810 EDA 2013. The Pennsylvania Superior Court affirmed this Court's judgment of sentence in its Opinion, dated April 7, 2016. *Id.* The Pennsylvania Supreme Court denied Appellant's Petition for Allowance of Appeal on August 30, 2016.

Appellant filed a *pro se* Petition for Post-Conviction Relief on July 27, 2017. This Court appointed Appellant's current PCRA counsel on January 24, 2018, and PCRA counsel filed an Amended Petition for Relief Pursuant to the Post-Conviction Relief Act on April 19, 2018. The Commonwealth responded to Appellant's Amended Petition on May 25, 2018, and a PCRA hearing was held on September 18, 2018. Following the hearing, PCRA counsel filed a Memorandum of Law in Support of the Amended Petition for Post-Conviction Relief and the Commonwealth filed a Memorandum of Law in Opposition to the Amended Petition for Post-Conviction Relief. Upon consideration of the Memoranda of Law and the record in the case, this

---

[5] 18 Pa. C.S.A. § 2502(b).
[6] 18 Pa. C.S.A. § 90(c).
[7] 18 Pa. C.S.A. § 3701(a)(1)(i).
[8] 18 Pa. C.S.A. § 903(c).

5

Court denied Appellant's Petition on November 15, 2018. On December 4, 2018, Appellant filed a timely Notice of Appeal from the denial of post-conviction relief to the Superior Court.

## III.   MATTERS COMPLAINED OF ON APPEAL

On December 20, 2018, this Court issued an Order pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), directing Appellant to file a Concise Statement of Matters Complained of on Appeal. On January 10, 2019, Appellant filed such a Statement, which raised the following issues, *verbatim*:

1. The Lower Court erred in denying Appellant's PCRA claim that trial counsel was ineffective in not properly preparing for trial with Appellant, consulting with Appellant and personally meeting with Appellant; and,

2. The Lower Court erred in denying Appellant's PCRA claim that he was denied his constitutionally guaranteed right to effective representation, and trial counsel was ineffective when counsel failed to advise Appellant and discuss with Appellant that counsel would not present Appellant's alibi defense and alibi witnesses at the time of trial.

## IV.   ANALYSIS

We find that Appellant is not eligible for the relief requested in his appeal from the denial of post-conviction relief because Appellant did not meet his burden of proving that trial counsel was ineffective. To be eligible for relief under the PCRA, Appellant must plead and prove by a preponderance of the evidence that the conviction or sentence resulted from ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. 42 Pa. C.S.A. § 9543(a)(2)(ii). To be entitled to relief on an ineffectiveness claim, Appellant must prove (1) that the underlying claim is of arguable merit, (2) that counsel's performance lacked a reasonable basis, and (3) that counsel's ineffectiveness caused him prejudice. *Commonwealth v. Pierce*, 786 A.2d

6

203, 213 (Pa. 2001); *see also Commonwealth v. Solano*, 129 A.3d 1156, 1162 (Pa. 2015). Failure to establish any prong of the test will defeat an ineffectiveness claim. *Commonwealth v. Basemore*, 744 A.2d 717, 738 n. 23 (Pa. 2000) (citing *Commonwealth v. Rollins*, 738 A.2d 435, 441 (Pa. 1999) (ordinarily, post-conviction claim of ineffective assistance of counsel may be denied by showing petitioner's evidence fails to meet any one of three prongs for claim)).

The Pennsylvania Supreme Court has explained, "As a general and practical matter, it is more difficult for a defendant to prevail on a claim litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error." *Commonwealth v. Gribble*, 863 A.2d 455, 472 (Pa. 2004). That is because prejudice in the context of ineffective assistance of counsel means demonstrating there is a reasonable probability that, but for counsel's error, the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 724 A.2d 326, 332 (Pa. 1999).

As a general rule, matters of trial strategy are left to the determination of counsel, and a defendant is not entitled to appellate relief simply because a chosen strategy is unsuccessful. *See Commonwealth v. Tippens*, 598 A.2d 553, 556 (Pa.Super. 1991) (en banc). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Commonwealth v. Lee*, 585 A.2d 1084, 1089 (Pa.Super. 1991) (quoting *Strickland v. Washington*, 466 U.S. 668, 690–691 (1984)). "The decision not to present a particular defense is a tactical one and will not be deemed ineffective stewardship if there is a reasonable basis for that position." *Commonwealth v. Blair*, 421 A.2d 656, 660 (Pa. 1980). Accordingly, "[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives

7

available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller*, 431 A.2d 233 (Pa. 1981). The Court should inquire whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect defendant's interests. *See Commonwealth v. Hill*, 301 A.2d 587 (Pa. 1973). Thus, counsel's assistance is deemed constitutionally effective once the Court is able to conclude the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney*, 235 A.2d 349, 352 (Pa. 1967). The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Id.* at 352-353.

When evaluated pursuant to the above standards, Appellant's claim that trial counsel was ineffective by not properly preparing for trial with Appellant, consulting with Appellant, and personally meeting with Appellant fails. To find that Appellant was denied effective representation of counsel, the Court must determine that the course chosen by Appellant's trial counsel was without a reasonable basis designed to effectuate Appellant's interests, keeping in mind that the burden is upon Appellant to demonstrate counsel's incompetence. *Commonwealth v. Murray*, 305 A.2d 33 (Pa. 1973). The length and frequency of consultations alone cannot support a finding of ineffectiveness. *Commonwealth v. Johnson*, 51 A.3d 237, 244 (Pa.Super. 2012). In fact, the Superior Court has held that mere shortness of time for a defendant to confer with his counsel before trial does not constitute ineffective assistance of counsel per se. *Commonwealth v. Robinson*, 334 A.2d 687, 688 (Pa.Super. 1975).

Appellant's allegation that trial counsel was inadequately prepared is baseless. In his post-hearing Memorandum of Law, Appellant admits that even without knowing what his counsel's

8

chosen strategy was, he avoided a first degree murder conviction; however, he speculates that "it is probable that had [Appellant] been prepared for trial and had an agreed trial strategy, the outcome of the proceedings would have been different." Appellant's Memorandum of Law, pp. 7-8. Yet, when specifically asked at the PCRA evidentiary hearing what evidence counsel should have presented that he did not, Appellant responded, "Well, at this time I can't answer." N.T. 9/18/18, p. 23. When further questioned, Appellant's only suggestion was that he believed counsel could have asked more questions of Ms. Bakr and Ms. Henderson on cross-examination. N.T. 9/18/18, pp. 23-25. However, according to Appellant, trial counsel's reasoning for not further impeaching the witnesses was that he "couldn't go too hard on them." N.T. 9/18/18, p. 24. Cross-examination is a matter of trial strategy left to the determination of trial counsel and pursuant to the Superior Court's reasoning in *Tippens*, trial counsel was not ineffective by not asking more questions of certain witnesses at trial.

Furthermore, Appellant's claim that he and counsel did not adequately strategize and communicate before trial is contradicted by trial counsel's testimony at the PCRA hearing and by his time sheet recording the number of times he and Appellant met. In fact, Appellant's trial counsel met with him on an almost weekly basis. N.T. 9/18/18, p. 32. At the PCRA hearing, Appellant's trial counsel testified that he met with Appellant twelve times in the Northampton County Correctional Facility for a total of thirty eight hours between April and September of 2012. N.T. 9/18/18, p. 30; Exhibit D-PCRA-1. In fact, counsel specifically requested that Appellant be housed in the Northampton County Correctional Facility because its proximity to counsel's home would facilitate more frequent meetings. N.T. 9/18/18, pp. 35-36. Although trial counsel stopped tracking his time in September because Appellant's father refused to pay him, he testified credibly that he met with Appellant another fifteen to twenty times between October, 2012, and the start of

9

trial in May, 2013. N.T. 9/18/18, p. 30, 36. Trial counsel made the strategic decision to meet with Appellant in person rather call him or send him letters because prison calls are recorded and counsel felt he was able to communicate more effectively with Appellant in person. N.T. 9/18/18, p. 32. However, this Court notes that trial counsel was available to Appellant because he gave Appellant his business card and cell phone number. N.T. 9/18/18, p. 31.

Based on the foregoing, we conclude that counsel was not ineffective for failing to properly prepare for trial with Appellant, consult with Appellant, or personally meet with Appellant. Not only did trial counsel present reasonable, strategic bases for his decisions in this context, but Appellant has failed to prove that the outcome of his case would have been different but for counsel's alleged ineffectiveness. As the Pennsylvania Supreme Court has held, "where it is clear that Appellant has failed to meet the prejudice prong [of his ineffective assistance of counsel claim], the claim may be disposed on that basis along, without a determination of whether the first two prongs have been met." *Commonwealth v. Wilson*, 672 A.2d 293, 298 (Pa. 1996), *cert. denied*, 519 U.S. 951 (1996) (citations omitted).

For the same reason, we find no merit to Appellant's claim that counsel was ineffective because he failed to advise Appellant that he would not present Appellant's alibi defense at the time of trial. Initially, we note that Appellant testified at the PCRA hearing that his trial counsel did in fact make him aware of his defense, which was to concede Appellant's presence at the scene and argue that Appellant was unaware that a murder was going to happen. N.T. 9/18/18, p. 15. Appellant admitted that trial counsel discussed not pursuing an alibi defense with him. N.T. 9/18/18, p. 15-16.

In order to prevail on an ineffectiveness claim based on counsel's alleged failure to call a witness, Appellant must establish, among other things, that the proposed testimony of the uncalled

10

witness would have been helpful to the defense asserted at trial. *See Commonwealth v. Morris*, 684 A.2d 1037, 1044 (Pa. 1996). Specifically, to show ineffectiveness for not presenting alibi evidence, Appellant must establish that counsel had no reasonable basis for his act or omission. *See Commonwealth v. Rainey*, 928 A.2d 215, 234 (Pa. 2007).

In this case, trial counsel was aware of the alibi witnesses Appellant identified, provided notice of those witnesses to the Commonwealth as required under the Rules of Criminal Procedure, and contacted those witnesses as part of his investigation of the case. N.T. 9/18/18, pp. 33, 37-38. However, after speaking with the purported alibi witnesses, he determined that they did not in fact provide an alibi for Appellant because they could not place Appellant in Trenton, New Jersey around the time of the murder. N.T. 9/18/18, p. 33. In addition, the police interviews of these witnesses corroborated counsel's determination that the testimony of the witnesses would not have furthered an alibi defense. N.T. 9/18/18, p. 34, 38. Therefore, the proposed testimony of the alibi witnesses would not have been helpful to the defense asserted at trial.

Furthermore, Appellant's claim that he was in Trenton around the time of DeGennaro's murder was contradicted by his cell phone records, which placed him near the DeGennaro residence around the time of the murder. N.T. 9/18/18, p. 21. Counsel also concluded that Appellant's admissions to him that he was at the DeGennaro residence when the murder occurred made it ethically impossible to present an alibi defense which he knew to be false. N.T. 9/18/18, p. 39. In the absence of a viable alibi defense, counsel instead pursued a strategy that conceded Appellant's presence at the scene, but minimized his involvement in the murder. N.T. 9/18/18, pp. 32-33. We find no prejudice, hence no ineffectiveness, because any testimony that may have placed Appellant in Trenton around the time of the murder would have been contradicted by both the testimony of Ms. Bakr and Ms. Henderson, and by Appellant's cell phone records which placed

11

him in Levittown, Pennsylvania. Again, counsel made a reasonable, strategic decision about how to defend the case after performing a thorough investigation of the alibi witnesses and assessing the likelihood of success of such a defense. In addition, Appellant did not meet his burden of proving how the outcome of his case would be different but for trial counsel's alleged ineffectiveness in pursuing an alibi defense. Since Appellant failed to show how trial counsel's alleged ineffectiveness caused him prejudice, his claims on appeal fail.

## V.    **CONCLUSION**

For the foregoing reasons, we respectfully submit that Appellant's arguments are without merit and his appeal should be denied.

DATE:                                            BY THE COURT:

January 22, 2019

RÉA B. BOYLAN, J.

12

Copies to:

Patrick McMenamin, Esquire
McMenamin & Margiotii, LLC
2307 North Broad Street
P.O. Box 180
Lansdale, PA 19446
*Counsel for Appellant*

Jill Graziano, Esquire
Bucks County District Attorney's Office
Bucks County Justice Center
100 North Main Street
Doylestown, PA 18901
*Counsel for the Commonwealth*